**In the Matter Of:**

JOANNA CARROLL vs SALE ABUBAKAR

1:23-CV-04909-ELR

**DR. DAVID J. GOWER**

*September 11, 2024*



800.211.DEPO (3376)
EsquireSolutions.com

```
1                UNITED STATES DISTRICT COURT
                          FOR THE
2                 NORTHERN DISTRICT OF GEORGIA


3
     JOANNA CARROLL,                    )
4                                       )
                 Plaintiff,             )    CIVIL ACTION NO.
5                                       )    1:23-CV-04909-ELR
         vs.                            )
6                                       )    Atlanta, Georgia
     SALE ABUBAKAR, W TRUCKING          )
7    GROUP, INC. & STATE NATIONAL       )    Wednesday
  INSURANCE COMPANY,                    )    September 11, 2024
8                                       )
                 Defendants.            )    1:10 p.m.
9    _____       )

10

11

12

13                    DEPOSITION OF
                    DR. DAVID J. GOWER
14

15

16
                  Taken by the Plaintiff
17                  Joanna Carroll

18

19
               Anthony Patterson, CER -2819
20             Esquire Deposition Solutions

21

22

23      Proceedings recorded by electronic sound recording;
       Transcript produced by the reporter and transcriber.
24

25
```



```
 1                    APPEARANCES OF COUNSEL

 2

 3    On behalf of the PLAINTIFF:

 4         ROBERT O. BOZEMAN, ESQ.
           DAVIS BOZEMAN LAW FIRM
 5         Trinity Office Park C
           4153 Flat Shoals Parkway
 6         Suite #332
           Decatur, Georgia 30034
 7         404-244-2004
           rbozeman@davisbozemanlaw.com
 8         APPEARED VIA VIDEOCONFERENCE

 9    On behalf of the DEFENDANTS, SALE ABUBAKAR, W TRUCKING
      GROUP, INC.:
10
           JOHN DIXON, ESQ.
11         DOROTHY SPINELLI, ESQ.
           DENNIS, CORRY, SMITH & DIXON, LLP
12         900 Circle 75 Parkway
           Suite 1400
13         Atlanta, Georgia 30339
           404-365-0102
14         jdixon@dcplaw.com
           dspinelli@dcplaw.com
15         APPEARED VIA VIDEOCONFERENCE

16
      On behalf of the DEFENDANT STATE NATIONAL INSURANCE:
17
           ADAM J. NORTH, ESQ.
18         HALL BOOTH SMITH, PC
           191 Peachtree Street Northeast
19         Suite 2900
           Atlanta, Georgia 30303
20         404-954-5000
           anorth@hallboothsmith.com
21         APPEARED VIA VIDEOCONFERENCE

22

23

24

25
```



```
 1                    INDEX TO EXAMINATION

 2

 3    EXAMINATION                                        PAGE

 4    Examination By Mr. Bozeman                           6

 5    Certificate                                         56

 6    Certificate of Transcriptionist                     57

 7

 8                     INDEX OF EXHIBITS

 9    PLAINTIFF'S        DESCRIPTION                      PAGE

10    Exhibit 1        Dr. Gower Report/Opinions          11

11

12

13    (Plaintiff's Exhibit 1 was retained.)

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1              Deposition of DR. DAVID J. GOWER
 2                    September 11, 2024
 3          THE REPORTER:  Okay.  We are now on the
 4   record.  The time is 1:10 p.m., Eastern Standard Time
 5   on September 11th, 2024, to take the deposition of Dr.
 6   David J. Gower in the case of Joanna Carroll versus
 7   Saleh Abubakar, et al.  My name is Anthony Patterson,
 8   notary public and Georgia certified court reporter for
 9   Esquire Deposition Solutions.
10          Pursuant to the Federal Rules of Civil
11   Procedure, I will be capturing the verbatim record of
12   today's proceeding using electronic audio equipment, a
13   computer, and specialized recording software, which is
14   not a form of stenography.  The witness is located in
15   Atlanta, Georgia, and has confirmed his identity with
16   driver's license.
17          Will everyone in attendance please identify
18   yourselves for the record and state whom you represent.
19          MR. BOZEMAN:  I'm attorney Rob Bozeman.  I
20   represent the plaintiff, Joanna Carroll.
21          MR. DIXON:  John Dixon on behalf of
22   defendants.
23          MR. NORTH:  Adam North, on behalf of --
24          MS. SPINELLI:  Dorothy --
25          MR. NORTH:  -- State National Insurance.
```



```
1              MS. SPINELLI:  Dorothy Spinelli.  Once my
2     entry of appearance is filed, will be appearing on
3     behalf of the defendants.
4              THE REPORTER:  All right.  Thank you,
5     Counsels.  Absent --
6              MR. NORTH:  Before we start.
7              THE REPORTER:  Yes.
8              MR. NORTH:  -- would you mind muting yours --
9              THE REPORTER:  Oh, sorry.
10             MR. NORTH:  -- because it echoes back?  Thank
11    you.
12             THE REPORTER:  Okay.  Absent any objection at
13    this time, counsel and the witness agree to my remote
14    administration of the oath to this witness and that the
15    final transcript may be used for all purposes allowed
16    by the Federal Rules of Civil Procedure.
17             MR. DIXON:  It's agreeable.
18             THE REPORTER:  All right.
19             MR. BOZEMAN:  Agreeable.
20             THE REPORTER:  Hearing no objection, this
21    shall constitute agreement and stipulation of such, and
22    I will now swear in the witness.
23             Dr. Gower, please raise your right hand to be
24    sworn, sir.
25                        DR. DAVID J. GOWER,
```



1   having first been duly sworn, testified as follows:

2          THE REPORTER:  Thank you, sir.  Counsel, you

3   may now begin.

4          MR. BOZEMAN:  Thank you, Mr. Patterson.  This

5   is the deposition of Dr. David Gower being taken

6   pursuant to notice and agreement of counsel.  The

7   deposition is being taken for the purpose of discovery

8   and all of the purposes allowed by the Federal Rules of

9   Civil Procedure and the Georgia Civil Practice Act.

10  The witness has been sworn in.

11                      EXAMINATION

12  BY MR. BOZEMAN:

13  Q.   Good afternoon, Mr.[sic] Gower.  My name is Rob

14  Bozeman and I represent the plaintiff.  I don't think

15  we've ever met.  I don't think I've ever deposed you

16  before, but if I have or have not, greetings to you,

17  okay?

18  A.   Thank you, sir.

19  Q.   All right.  Welcome.  You've been retained and

20  disclosed as an expert in this case.  And my job today

21  is just to ask you some questions about your opinions

22  and how you formed those opinions, and a little bit

23  about your background, and I think we can get in and

24  get out of here, okay?

25  A.   Yes, sir.  I understand.



1    Q.    All right.  Let's just do some little

2    preliminaries.  Why don't you state your full name for

3    the record for me?

4    A.    David John Gower.

5    Q.    All right.  And Dr. Gower, I'm calling you Dr.

6    Gower because, obviously, I've read your CV.  But why

7    don't you tell us a little bit about your educational

8    background and your professional background?

9    A.    I went to undergraduate and medical school at the

10   University of Florida.  Finished in 1981.  I did a year

11   of internship and six years of neurosurgery residency,

12   and that was in Winston-Salem at -- at Bowman Gray

13   School of Medicine.  It's Wake Forest.  Subsequently

14   went into practice in 1988.  I ended up practicing at

15   the University of Oklahoma as an assistant professor.

16   I moved to North Carolina and practiced one year in

17   North Carolina and then moved to Georgia -- I think it

18   was '94 I moved to Georgia -- and I've been here ever

19   since.

20   Q.    Okay.  Professionally, are you a practicing doctor

21   right now or are you retired?

22   A.    I do have a Georgia license.  I do not see

23   patients.  I retired from clinical practice in 12 of

24   '22.

25        And -- excuse me -- could you turn that down a



1   little bit?  It -- it echoes back through the

2   headphone.  Thank you.

3   Q.   And when you -- when you stopped seeing patients

4   in December of '22, where were you employed at that

5   point?

6   A.   I was employed by Piedmont Physicians Group.

7   Q.   And how long did you work with Piedmont Physicians

8   Group?

9   A.   Six years.

10  Q.   And how long have you done expert testimony work

11  or expert review?

12  A.   Thirty-four years.  I mean, it -- it starts the

13  first day you start in practice.  Sometimes it's your

14  own patient with an automobile accident.  Sometimes

15  it's an attorney asking you to review a case.  But it's

16  from the very beginning.

17  Q.   Since '22 when you were no longer working for the

18  Piedmont Physicians Group, would you say your sole

19  source of income has been record review and testimony?

20  A.   No.  I also -- I have investments from my savings

21  and my wife has investments and earnings also.  So.

22  it's -- it's not my sole source of income.

23  Q.   I got it.  So outside of investments, that would

24  be -- I -- I consider investments passive income, but

25  active, so let's just distinguish those two.  Have you



1   received active income doing any other pursuits other

2   than expert testimony and review?

3   A.    No.  No.

4   Q.    Okay.  So the only thing you're doing to make

5   money actively is expert testimony and review, correct?

6   A.    Correct.

7   Q.    In the last year, do you have an idea of how many

8   cases you have reviewed?

9   A.    Number of cases?  No, I don't.

10  Q.    Do you have an idea of how much money you made in

11  the -- in, say, 2023 from active review of cases?

12  A.    In '23, yes.  Because you had originally

13  subpoenaed my records and those numbers weren't

14  available because it was before tax season.  After tax

15  season, I now have the records.  In 2023, I made $8,825

16  in W-2 income, which was my last paycheck from

17  Piedmont.  And I made $262,747 from 1099 income, which

18  is, as you mentioned, passive income from medical-legal

19  reviews.

20  Q.    Got it.  Well, actually, I -- I -- medical- legal

21  reviews, in my opinion, was active income.  It was your

22  financial portfolios is what I call passive income,

23  okay?

24  A.    I -- I misspoke it.  That's active income.

25  That's -- that's earned income reported --



1   Q.   Correct.

2   A.   -- on 1099s.

3   Q.   Correct, correct.  That's fine.  I understand what

4   you meant.  I just want it to be clear for the record.

5   A.   Yes, sir.

6   Q.   Of that $262,000 that you made, what percentage --

7   and I know it doesn't have to be an exact number -- but

8   what percentage, 90 percent, 95 percent, 99 percent,

9   what percent would have been you being hired by defense

10  lawyers or insurance companies?

11  A.   Probably 95 percent.

12  Q.   And the other five percent, would that have been

13  plaintiff's firms or some other, like, government

14  entities hiring you?  I think I read something about

15  maybe the state medical board hiring you?

16  A.   Yes.  I've reviewed cases for the state medical

17  board; that's income.  I've reviewed cases for

18  plaintiff's attorneys also.  That's also 1099 income.

19  Q.   Got it.  And then that -- and then all of that

20  would be included in five percent of your income?

21  A.   Yes, sir.

22           MR. BOZEMAN:  Okay.  Let's take a look at --

23  I want to show you what I've marked, and I -- I think

24  it's your opinion.  This is what you've given me, but

25  I've marked it as Plaintiff's Exhibit 1.



DR. DAVID J. GOWER                                September 11, 2024
JOANNA CARROLL vs SALE ABUBAKAR                                11

1          (Plaintiff's Exhibit 1 was marked for

2     identification.)

3     BY MR. BOZEMAN:

4     Q.    I'm going to try to share my screen and see if you

5     can see it.  Let me know if you can see my screen or

6     when you can see my screen.

7     A.    Yes, I can.

8     Q.    All right.  What I'm showing you is what I've

9     marked as Plaintiff's Exhibit 1 and it is five pages.

10    I believe you sent it to me, so you should be familiar

11    with it.  I'm going to just scroll down these five

12    pages and then you let me know.  And I believe I'm

13    going to stop on page 5.

14          And first thing I'm going to ask you is:  Can you

15    identify what I've marked as Plaintiff's Exhibit 1?

16    A.    Yes.

17    Q.    All right.  And is that your signature above what

18    has been typed out as David J. Gower, M.D.  FACS?  Then

19    under that neurosurgery, then there's a signature.  Is

20    that your signature?

21    A.    Yes, it is.

22    Q.    Okay.  So you can identify this document,

23    Plaintiff's Exhibit 1, as a document that you signed.

24    And is it a document that you provided to my firm?

25    A.    Well, I -- I provided it to the defense firm



1  because it's a federal court and this is the report

2  that was requested.

3  Q.  Okay.  And you can --

4  A.  I think they'd probably sent it to you.

5  Q.  Thank you.  So you can identify this as the report

6  that you provided to the attorney who hired you and

7  then that attorney obviously provided it to me?

8  A.  Yes, sir.

9  Q.  Okay.  And does this document contain all of your

10 opinions?  And let's go through it.  It says date

11 review and there are from PDFs, radiology review, then

12 there are findings.  A section says findings.  And then

13 there are -- it looks like some pictures of images.

14 And then lastly opinions.  Are those the sections that

15 you provided?

16 A.  Yes, it is.

17 Q.  Is there anything else?  Is anything left out?

18 This is complete?

19 A.  Since this was completed, I've received the

20 deposition from Dr. Puppala, but I believe that other

21 than that, it's complete.

22 Q.  I got it.  Okay.  So you have reviewed Dr.

23 Puppala's deposition?

24 A.  Yes.

25 Q.  Does that change any of your opinions?



DR. DAVID J. GOWER                                September 11, 2024
JOANNA CARROLL vs SALE ABUBAKAR                            13

1    A.    Concerning the patient?  No.

2    Q.    Just the opinions that you have here, number one

3    through four that you -- that you're going to provide

4    at trial?

5    A.    In -- in reference to this case, these are the

6    opinions that I have referable to Ms. Carroll.

7    Q.    Yeah.  I guess what I'm saying is now that you

8    read Dr. Puppala's deposition, is there going to be a

9    number five or is this -- is this -- does this still

10   capture your complete opinions?  I just don't want -- I

11   don't want any surprises.

12   A.    I'm sorry.  Okay.  It -- it captures my -- my

13   opinions concerning her care after this motor vehicle

14   accident.

15   Q.    Okay.  Got it.  Well, let's just -- let's go

16   through this exhibit a little bit, and if you could

17   just walk me through it.  It starts, obviously, with

18   the case caption, and then it reads, "I have been asked

19   by John Dixon with the law firm of Dennis, Corry, Smith

20   & Dixon to review the medical records and images on

21   Joanna Carroll following her motor vehicle accident and

22   offer my opinions on her reported injuries and

23   treatment.  I have charged 2,500 for the medical review

24   and $600 for preparation of this written report."  That

25   seems straightforward.



1        Anything -- anything changed there?

2    A.   No, sir.

3    Q.   All right.  Let's go to the next section, data

4    review.  The date review, there are one, two, three,

5    four, five, six, seven, eight, nine PDFs that you

6    reviewed.  I'm not sure what that first PDF is.  It

7    just says 3978 PDF.  I'm not sure what that is, but the

8    other ones are pretty self-explanatory.

9        Can you recall what that first PDF is?

10   A.   No, sir.  I don't.

11   Q.   Okay.  And is this helping?  Am I making it

12   larger?

13   A.   You are making it larger, but it -- it wasn't a

14   problem to read it.

15   Q.   It wasn't?  Okay.  All right.  All right.  All

16   right.  So you don't recall what the first one is, but

17   the rest of them, it looks like AICA Orthopedics.  Is

18   that medical records?

19   A.   Yes, sir.

20   Q.   And the same for Athens, same for Atlas

21   Comprehensive.  And there was a demand.  I'm assuming

22   that was a demand that my law firm submitted; is that

23   correct?

24   A.   I believe so.  Yes.

25   Q.   All right.  And then this --



```
1              THE REPORTER:  One minute.  One minute, Mr.
2    Bozeman.
3              Mr.[sic] Gower, it sounds like your audio is
4    kind of lowered, like it lowered or something.
5              THE WITNESS:  Is that better?
6              THE REPORTER:  Yes, sir.  Thank you.  Keep
7    it -- keep it right there.
8              THE WITNESS:  Okay.  I think (crosstalk).
9              THE REPORTER:  All right.  Thank you.
10             MR. BOZEMAN:  Okay.  No worries.
11   BY MR. BOZEMAN:
12   Q.  So there's a demand.  I'm assuming that's the
13   demand that my law firm sent to -- regarding Joanna
14   Carroll; is that correct?
15   A.   I believe so, yes.  And it contains medical
16   records, in addition.
17   Q.   Okay.  And then there's Joanna Carroll's responses
18   to discovery.  You reviewed that as well?
19   A.   Yes.
20   Q.   Okay.  Lotus Diagnostic and US Medical Health?
21   A.   Yes.
22   Q.   All right.  Then you --
23   A.   The next sentence is --
24   Q.   Go ahead.
25   A.   I'm sorry.  The -- the next one, as we talked
```



1  about, is the deposition of Dr. Puppala.

2  Q.    Got it.

3  A.    That's not included.  And it's mainly because this

4  report was completed before I obtained that -- that

5  deposition.

6  Q.    Okay.  So if this was redone, the only thing that

7  would change is you would have Dr. Puppala's deposition

8  as a tenth PDF?

9  A.    Correct.

10  Q.    Perfect.  All right.  Let's go to radiology.

11  Radiology reviewed.  Can you tell us -- it looks like

12  you studied the L5-S1 ESI.  Is that an injection?

13  What's happening there?

14  A.    The -- there, as you can see on a couple columns

15  over, there's three.  That's the number of X-rays in

16  that series.  There are three X-rays of the epidural

17  steroid injection.  And the date it was acquired was on

18  11-1-22.  So that's the day that that procedure was

19  accomplished.

20  Q.    Okay.  Got it.  And then the next one is the

21  lumbar spine MRI?

22  A.    Yes, sir.

23  Q.    And then the third one is the cervical spine MRI?

24  A.    Yes, it is.

25  Q.    And then the fourth one is the C spine.  What does



1  the CR stand for?

2  A.   I think it means cut film radiology.  It's -- it's

3  X-rays.

4  Q.   X-rays.  Okay.

5  A.   I'm not sure exactly what that stands for, but

6  that's -- that's what it represents.

7  Q.   Okay.  So the first one and the fourth are X-rays;

8  the second one and the third are MRIs?

9  A.   Yes.

10  Q.   Perfect.  All right.  And then you go to findings.

11  And tell us about these findings.  Are these findings

12  done like a timeline?  Is this in chronological order?

13  A.   Yes, it is.  Because the -- the records almost

14  never are in chronological order, so I create a

15  spreadsheet based on the date, what was done, who saw

16  the patient, what was done, when there were procedures,

17  when there were radiology imaging studies completed.

18  And then it can be ordered in -- into a timeline, and

19  that's what this is.

20  Q.   And then how do you decide what do you include in

21  a timeline and what you don't include in a timeline?

22  Is it just what you think is important?

23  A.   Yes.  If somebody goes into the office and has

24  sinus drainage, it doesn't have really any relevance to

25  their injury.  And I -- I usually leave that out.  But



1   if it is in any way relevant to the injury or the

2   complaint, I -- I put it in.

3   Q.   Okay.  All right.  My first question is:  So the

4   accident occurred -- and I think you have it here,

5   September 13th, 2022, correct?

6   A.   Yes, sir.

7   Q.   But prior to that, you have an entry from May 5th,

8   2022.  So about four months prior, correct?

9   A.   Yes.  Yes.

10  Q.   So what -- what was the import of this entry from

11  May 5th, 2022?

12  A.   It -- it basically gave an idea that of the

13  medication she was taking prior to -- one of the things

14  she isn't taking is a pain medication -- and that she

15  had a previous surgery for ovary removal.

16  Q.   Okay.  So --

17  A.   It -- it -- I'm sorry.  It reinforces the fact

18  that she really doesn't have a significant medical

19  history.

20  Q.   Okay.  So this would reinforce that prior to the

21  September 13th wreck, Ms. Carroll did not have a

22  significant -- significant history with respect to neck

23  or back pain; would that be correct?

24  A.   As far as we can tell from the records that I

25  have, that's true.  I mean, she's only 18 years old, so



1    you wouldn't expect it.  But this -- this helps

2    reinforce that.

3    Q.   Okay.  So -- so if she said that she was pain free

4    before this incident, you wouldn't have anything to

5    dispute that?

6    A.   That's correct.

7    Q.   And, in fact, it would -- it would be surprising

8    if she was in pain prior to the accident at her age?

9    A.   It's uncommon for an 18-year-old to have

10   significant back pain.  It -- it -- yes -- (crosstalk).

11   Q.   I understand.

12   A.   I would have been surprised -- I would have been

13   surprised and if it didn't show up in any of the

14   medical records prior to this.

15   Q.   Okay.  Got it.

16   A.   (Crosstalk)

17   Q.   And then as far as the medicals that she was on,

18   fluoxetine, do you know what that's for?

19   A.   No.  I -- I really don't.  I'd have to look it up.

20   Q.   Adalalol (phonetic)?

21   A.   I think -- I think that's an oral contraceptive,

22   but I'm not sure.

23   Q.   Okay.  Adderall?

24   A.   Adderall is for attention deficit.

25   Q.   Okay.  And then I'm sorry, and I -- I hate to go



1  back, "congenital prolonged QT interval".  What does

2  that mean?

3  A.   It -- it's a cardiac issue.  There's a -- between

4  the Q wave and the T wave, there's a -- it's longer

5  than most people would have, and that's why she went to

6  Athens Internal Medicine was because of that finding.

7  But I don't believe that ever amounted to anything.

8  Q.   Got it.  And then lastly, "Surgery, right ovary

9  removal."  Was that --

10 A.   Yes.

11 Q.   -- performed at Athens Internal Medicine?

12 A.   No, it was not, but it's listed in the history and

13 physical.  So it -- it gives you an idea that she had

14 minimal surgeries.  And although that can be a -- a

15 fairly big deal, removing an ovary, it -- it really

16 doesn't have much to do with her back.

17 Q.   Got it.  Okay.  So at the end of the day, no

18 significant medical history that relates to the issues

19 in this case, correct?

20 A.   As far as I know.  Yes, correct.

21 Q.   All right.  Okay.  So let's move forward to

22 September 13th.  We know she was struck from behind by

23 a motor -- by a tractor-trailer.  All right.  All

24 right.  So what's significant about September 13th?

25 A.   She goes to an urgent care and her complaints are



1  left shoulder pain and back pain running down the left

2  leg.

3  Q.   Okay.  And then September 14th, I -- I think this

4  is pretty self-explanatory.  She -- she starts treating

5  for chiropractic and physical therapy, correct?

6  A.   Yes.  At an organization called AICA.

7  Q.   Okay.  And then September 16th, is there anything

8  significant about that day?  I think, like, one of the

9  longest entries.  So let's talk about it.  What --

10  A.   Well, this --

11  Q.   What made -- yeah.

12  A.   I'm sorry.

13  Q.   What was significant to you?

14  A.   This was her first examination by a -- a

15  physician.  Well, at least a -- a -- that documents

16  neurologic exam and range of motion.  It -- actually,

17  Hertado (phonetic), who is -- is not a physician, he's

18  a physician's assistant, did an examination and history

19  as part of her intake into AICA.

20  Q.   Okay.  All right.  And it looks like she's still

21  complaining of neck, mid-back, and low back pain,

22  correct?

23  A.   Yes.

24  Q.   All right.  Let's go to the 19th.  I'm assuming

25  that's where she got -- took the MRI of her cervical



1  spine and the lumbar spine; is that correct?

2  A.   Correct.

3  Q.   All right.  What's significant about those two

4  MRIs?

5  A.   Nothing.  They're normal.

6  Q.   Okay.  Now, here you have cervical C5-6 shallow

7  disc herniations.  Is that your statement or is that

8  just a statement from the MRI results?

9  A.   That's the -- from -- that is copied from the --

10 or at least the -- not copied.  It's a condensation of

11 what the radiologist had said, Dr. Sunawaski

12 (phonetic).

13 Q.   All right.  So -- so according to the radiologist,

14 there was a shallow disk herniation at C5- C6.  I think

15 later on you -- you don't agree with that; is that

16 correct?

17 A.   I do not.

18 Q.   Okay.  So right here, you're just showing what the

19 radiologist report showed?

20 A.   Correct.

21 Q.   All right.  And that's the same for the lumbar?

22 A.   It's the same for the lumbar, but she only has

23 four lumbar discs.  The last vertebra did not separate

24 from the sacrum.  So she only has four lumbar vertebra

25 and four lumbar discs.  So his numbering actually is --



1  I hate to say incorrect.  It sounds like an error.

2  It's not.  You can't tell very well off an MRI.  And I

3  know this because I saw the plain films.  But it should

4  read L1-2, L2-3, L3-4, L4-5, shallow disc herniations.

5  He just numbered them, assuming that the last disc that

6  you see is in fact L5-S1, but it's not.

7  Q.   Now, is that something you saw or is that

8  something you got from Dr. Puppala's deposition?

9  A.   It's something that I saw from the plain films

10 that I was able to review, and it was reinforced by Dr.

11 Puppala's deposition.

12 Q.   Okay.  Is it anywhere -- is that -- is that

13 statement that you made anywhere in your report?

14 A.   I don't think so.

15 Q.   The issue with the -- the issue with the -- okay.

16 So it's not in your report.  I know Dr. Puppala -- did

17 you read that Puppala ever mentioned that in his

18 deposition --

19 A.   About the numbering --

20 Q.   Correct.

21 A.   -- controversy?  Yes, he did.

22 Q.   All right.

23          THE REPORTER:  Just a kind of reminder.

24 Please remember to speak one at a time for a clear

25 record.  You may now proceed.



1           MR. BOZEMAN:  Yes, sir.

2    BY MR. BOZEMAN:

3    Q.    Okay.  Let's move to September 30th.

4    A.    Yes, sir.

5    Q.    It looks like you thought it was significant that

6    Ms. Carroll is still complaining of -- she said she got

7    little relief from chiropractic treatment, correct?

8    A.    Yes.

9    Q.    Okay.  And there was a recommendation for a

10   cervical and lumbar ESI; is that correct?

11   A.    Yes, sir.

12   Q.    What does ESI stand for?  Do you know?

13   A.    Epidural -- epidural spinal injection.

14   Q.    Okay.  And what would be the purpose of an

15   epidural spinal injection?

16   A.    Or steroid injection.  I'm sorry.  Potentially to

17   settle down a nerve.  It's an attempt at controlling

18   pain.  It also can be diagnostic.  In other words, if

19   it works, it tells you you're on the right track.  If

20   it doesn't work, you're probably guessing wrong as to

21   what's generating the pain.

22   Q.    Okay.  Was -- have you ever recommended an ESI for

23   one of your patients?

24   A.    Yes.

25   Q.    Okay.  And it's for the reasons that you just



1    stated?

2    A.    Yes.

3    Q.    Okay.  Let's go to October 28th.  I -- I see that

4    you put here her back pain is 10 out of 10?

5    (Crosstalk).  Was that significant?  That was what was

6    reported?

7    A.    Yes, sir.

8    Q.    Okay.  And radiation down into her left foot,

9    correct?

10   A.    Yes.  Yes.

11   Q.    All right.  Then on November 1st, she actually had

12   the lumbar steroid injection; is that correct?

13   A.    Yeah.  Yes, she did.

14   Q.    All right.  And it looks like on the 21st, about

15   20 days later, the lumbar steroid injection provided 75

16   percent relief; is that correct?

17   A.    That's what she reported.

18   Q.    That's what she reported.  And then it looks like

19   about 20 days after that, her pain came back.  Is that

20   what you read?

21   A.    Yes, sir.

22   Q.    All right.

23   A.    It should be noted though, that that November 21st

24   also is a change in her physical examination prior to

25   the -- prior to that date, she had some complaints of



1  pain, but she also had -- the PA identified some

2  weakness and potential numbness.  And on the 21st,

3  after the first epidural, that resolved.  Her -- her

4  exams turned normal.

5  Q.   They turned normal on the 21st?

6  A.   When she was seen by Edwin Jones on the 21st

7  her -- her physical exam for motor, sensory, and

8  reflexes, as well as a straight leg raised test, and

9  the lower extremities was all normal.  The cervical

10 spine, same thing, motor, sensory, reflex, Spurling

11 sign, which happens when you turn your head to the

12 side, all normal at that point.

13 Q.   Okay.  And then 20 days later on the 12th, she

14 returned with pain again; is that correct?

15 A.   With complaints of pain, but again, physical exam

16 at that point was normal.

17 Q.   Okay.  And then what about on the 17th?  I guess

18 we're about a month.

19 A.   The -- the epidural steroid injection, original

20 one, it sounds like it was 80 percent effective, but

21 her pain in cervical spine now was nine out of ten.

22 Q.   Okay.  The 17th, she underwent another steroid

23 injection in her lumbar area, correct?

24 A.   Yes.  Yes.

25 Q.   Is it uncommon to have multiple steroid



1    injections?

2    A.    No.

3    Q.    What is -- is -- how many would -- do you get them

4    in a series or how does that work?

5    A.    It depends on the physician.  But if three don't

6    work, it's not going to work.  So it sounds like - -

7    Q.    Three?

8    A.    -- the first one -- that would -- I -- that's in

9    my practice that would I -- that's what I would say.

10   If you were not getting permanent and consistent relief

11   out of three, it's not going to work.

12   Q.    So right now, we are still at number two?

13   A.    Correct.

14   Q.    Okay.  And then it looks like she has her first

15   one in her cervical spine on the same day as well?

16   A.    Yes, sir.

17   Q.    All right.  Then on the 20th, she comes in and she

18   sees Dr. Jones again.  And it looks like she still has

19   pain; is that correct?

20   A.    She still reports pain, yes.

21   Q.    Okay.  Same -- and then -- and it looks like

22   there's a referral to Comprehensive Pain & Spine?

23   A.    Yes.

24   Q.    Okay.  And when she goes there, she still

25   complains of neck and back pain?



1   A.   Yes.

2   Q.   And I'm going to go down to March 22nd, 2023.  I

3   think you have it bolded.

4   A.   Yes.  It's a procedure.  So procedures and imaging

5   studies I bold so they're easy for me to pick out.

6   Q.   Got it.  So what happens at the March 22nd, '23

7   date?

8   A.   She has a five-level discectomy, one in her

9   cervical and four in her lumbar, accomplished by Dr.

10  Puppala, basically on her normal back.

11  Q.   Well, would you consider pain to be normal?

12  A.   Pain is not a pathology.  Pain is a symptom.  And

13  people say they have pain for all kinds of reasons.

14  One is because they have ouch, because something is

15  injured or damaged.  They -- I mean, people say it to

16  get medications, to get out of work, because they're in

17  a lawsuit trying to get money.  I mean, there are all

18  kinds of reasons people say they have pain, but it is a

19  symptom.  It's not an objective finding.  The -- there

20  is no objective finding that justifies that procedure

21  and the imaging studies clearly don't justify it.

22  Q.   All right.  We're going to take a look at that.

23  But the procedure on March 22nd, 2023, was a discectomy

24  in four levels in her lumbar spine and one level in her

25  cervical spine; is that correct?



1    A.    That's correct.  There's a percutaneous discectomy

2    as opposed to, like, a surgical procedure where you

3    make an incision and pull the muscle aside.  This you

4    stick a needle in and use something like a Roto-Rooter

5    to remount some of the disc.  I think it was a Stryker

6    Dekompressor is the -- the instrument that was actually

7    used.

8    Q.    Okay.  So she has those procedures.  And then on

9    April 5th, it says she's got 70 percent relief in her

10   lumbar spine and 70 percent relief in her cervical

11   spine, correct?

12   A.    That's what it says, yes.  And, no.  It was a

13   telemedicine visit.

14   Q.    All right.  And then on the 19th, it's another

15   telemedicine visit?

16   A.    Yes, sir.

17   Q.    And what is she -- what is she reporting at on the

18   19th?

19   A.    Well, the record reports that she said she had

20   four out of ten cervical pain and seven out of ten

21   lumbar pain.

22   Q.    Okay.  And then I see May 16th is bolded again.

23   So this is a procedure?

24   A.    Yes, it is.

25   Q.    All right.  And what happened at that procedure?



1   A.   This is called a Disc-FX, which is also basically

2   a percutaneous, a needle stick procedure.  There's

3   several options with that procedure.  One is you can

4   remove disc material, and the second is you can feed a

5   heated electrical wire into the disc space and

6   basically cook and kill the nerves.  And it was done,

7   same levels; one in the cervical and four in the

8   lumbar.

9   Q.   Okay.  And May 13th after that procedure -- May

10  30th -- I'm sorry -- after that procedure, what are her

11  complaints?

12  A.   Well, it's recorded that her lumbar pain is four

13  out of ten and her cervical pain was two out of ten 10.

14  Q.   Okay.

15  A.   It was also recommended she undergo additional

16  procedures with medial branch blocks, which is an

17  injection of a local anesthetic and/or a steroid into

18  the region where the nerve goes to the joint.  So it's

19  a totally different approach to treatment than the

20  discectomy is, and followed this with a radio frequency

21  lesion, the burn-the-nerve procedure.

22  Q.   Okay.  And I guess, does it say whether -- I -- I

23  mean, obviously, that procedure did not occur?

24  A.   It -- it doesn't appear to, as of the last note

25  that I have, which is June 13th of '23.



1  Q.   Yes.  And what's communicated on June 13th, '23?

2  A.   She desired to be released since the pain was

3  mostly improved.  Her pain level was three out of ten.

4  Q.   Okay.  So do you -- would you agree that her pain

5  improved over the course of this treatment?

6  A.   I don't know.  All I know is that her -- her

7  numbers improved that were reported by the -- the

8  physician's group.

9  Q.   But what she reported and -- what she reported is

10  that her numbers improved, her pain levels improved

11  over the course of this treatment?

12  A.   Well, her -- her -- the -- what the physicians

13  reported is that the numbers improved.  What she

14  actually said, I have no -- I have no way of knowing.

15  Q.   You didn't read her deposition?

16  A.   No, I don't.  I did not.

17  Q.   So if I represented to you that she stated her

18  pain improved over the course of this treatment, you

19  wouldn't disagree with that?

20  A.   That's correct.  But I have no way -- I have no

21  reference because, like I said, I don't have the

22  deposition.

23  Q.   I understand.  I have the deposition.  I read it.

24  And so I'm just saying, if I reported that, if I just

25  make that statement, a jury will -- a jury will be able



1  to hear her testimony.  So I'm sure it's going to be

2  consistent with what she testified under oath.  So I'm

3  just representing to you that she said her pain

4  improved over the course of this treatment.  You would

5  agree with that?  It had?

6  A.   I -- I would agree if -- if that's in her

7  deposition and I believe you, yes, I would agree.

8  Q.   Okay.  All right.  All right.  Let's go to the

9  next page of your report.  Show us, tell us what this

10  next page is.  It looks like these are images, but I'll

11  let you -- it's your report, so why don't you tell us?

12  A.   The -- the upper image is the cervical MRI scan.

13  This -- this is the disc level that was -- had the

14  needle stuck in it twice for a percutaneous discectomy.

15  The radiologist reported that she had a -- a herniation

16  or a bulge at the C5-6 level.  If you look at the left

17  image, you can see that each of the discs -- can I move

18  my cursor?  Can I -- yeah.  Can you see that moving?

19  Q.   I cannot.  I think because I'm showing my screen

20  --

21  A.   Oh, that's right.  Well, I --

22  Q.   I don't think I -- if you -- yeah, go ahead.

23  A.   I was prepared and I brought the picture.  I'm not

24  sure that's going to show up that well.  Yeah.  And

25  there's no way that I can, like, come around the back



1  and show it to you.  But the discs on that study are

2  absolutely normal.  They're of equal height all the way

3  through the spine.  There is no bulge whatsoever.  And

4  the disc that's supposed to bulge at five-six is what's

5  on the right side with the cross-section.

6       And what you see is the vertebra in the front

7  where those letters are, the C5-6, the hole for the

8  nerve that goes to your biceps and your thumb for

9  sensation goes through that hole between the arrows.

10  There's nothing there except the nerve.  And the spinal

11  cord, which is that sort of gray structure surrounded

12  by the white crescent, which is spinal fluid, is not

13  compressed.  There is -- this is a normal study.  There

14  is no indication whatsoever for any kind of invasive

15  procedure on this.

16  Q.   Yeah.  And I'm not -- obviously, I'm not a doctor.

17  I'm a lawyer.  But when I look at what you're showing

18  at C5-C6, it -- it looks to me that on the left side,

19  that is not the same room that it is on the right side.

20  Is that -- do you see that at all?  And, I mean, right

21  here at the spinal cord --

22  A.   Yes, sir.

23  Q.   -- it looks -- it looks like the right side.  You

24  can see the space on the right side, but not

25  necessarily on the left.



1   A.    No, no, I disagree.  It looks like the spinal

2   fluid is even all the way around.  There's plenty of

3   spinal fluid.  Don't forget the left side is opposite.

4   So what you're pointing to on -- on the right side of

5   the picture is actually the left side of the patient,

6   but there's --

7   Q.    So can you see -- can you see my arrow?

8   A.    Yes.

9   Q.    So is that when you -- when I say right side,

10  you're saying this is the left side?

11  A.    Where your arrow is now is on her left side.  And

12  I know that because in the very far -- it goes straight

13  to the -- that way.  No. Other way.  There's an L and

14  there's an R on the other side.  It shows you which

15  side of the patient you're dealing with.  In that

16  particular picture, it's the left.  If there was any

17  indication of a problem at -- at that level, it would

18  show up in a reflex, a sensation change in the thumb or

19  a weakness in the biceps.  None of those exist.  If

20  there was a problem with the spinal cord, it would be

21  spasticity or a reflex change.  None of those exist.

22  And this film is, in my eye, absolutely normal.

23  Q.    Okay.  Anything else you're trying to show with

24  this picture, the top picture?

25  A.    No, sir.  I just -- the goal of this was to



1  demonstrate to the jury how normal an 18-year-old spine

2  is.  You could put this in a -- a textbook and be proud

3  of it, and everybody would agree that -- well, I hate

4  to speak for everybody.  A good percentage, including

5  myself, would agree that this is a normal study.

6  Q.   All right.  Anything else about the top picture

7  that you're trying to communicate to us or to a jury?

8  A.   No, sir.  But just to be clear about it, her name

9  is in the upper -- very upper right corner as I

10 remember, yes.  And my picture, it's here.  That's her

11 name, and this is the date that the study was done, 9-

12 12-22.

13 Q.   It's 9-19-22 or 9-12-22?

14 A.   Nine-twelve.

15         THE REPORTER:  Yeah.  That -- that kind of

16 went out, your answer, mister -- Dr. Gower.

17         THE WITNESS:  Which did?

18         THE REPORTER:  Your last answer, it kind of

19 went out on my end.

20         THE WITNESS:  Oh.

21         MR. BOZEMAN:  I can re-ask the question.

22         THE REPORTER:  Yes, please.  Please do.

23 BY MR. BOZEMAN:

24 Q.   Yes.  You asked about -- we were talking about the

25 date, her name, her name being up at the top right



1  corner, which I agree with, and then the date being at

2  the bottom right corner.

3  A.   Yes, sir.  That's the date that the study was

4  accomplished.

5  Q.   9-12-22?

6  A.   No, sir, 9-19.

7  Q.   Nine-nineteen.  That's what I thought.  I thought

8  you said 9-12.

9  A.   That picture is just really small on my screen,

10  but I've got the actual -- the actual data here and the

11  -- it is 9-19-22.

12  Q.   Okay.  We agree then.  We're good.

13  A.   Okay.

14  Q.   All right.  Like, it looks like a nine to me.

15  Okay.  All right.  Let's look at -- anything else about

16  the top picture?

17  A.   No, sir.

18  Q.   All right.  What about the bottom picture?

19  A.   This is a normal back.  You can't tell about the

20  number of vertebra because MRI scan doesn't show bone

21  and you don't have a picture base on that shows you the

22  last rib.  There are usually five vertebra.  But not

23  everybody has five.  Some have four, some have six.

24  And this particular person, she has four lumbar

25  vertebra.



1      These discs are perfect.  There's nothing at all
2    wrong with them.  I'm going to use mine because I can
3    point to it.  The disc has normal height.  The center
4    of it is white.  A disc is built between two bones.
5    It's a gasket.  The center is filled with gristle.  The
6    gristle in a younger person is very springy, very
7    tough, and is elastic.  And that's why it's white.
8    It's hydrated and has water or -- or fluid as part of
9    its structure.
10      The outer part, the gray part, which you can see
11    here and here, that part is the annulus, the ligament
12    around the outside, that when the scan does the cut --
13    when the scan does the cut through it, you can see it
14    on the front and the back.  I hate to use the analogy
15    of the jelly donut, because the central disc material
16    on an 18-year-old is not jelly.  It's much tougher than
17    that.  But it gives you the idea that there's a shell
18    around the outside that when you cut through, you see
19    ligament in the back, ligament in the front, center
20    material.  That is an absolutely normal spine.  There
21    is no evidence whatsoever of any herniation or bulge.
22    Q.   All right, Doctor.  Anything else about the second
23    picture?
24    A.   No.  No.  Well, a couple of interesting things.
25    Again, her name is in the upper right corner.  The --



1  the date of the study, the 19th, is in the lower right

2  corner.  And the -- the nerves coming down through,

3  I'll use mine, like this.  The nerves are coming down

4  through here.  At each level, a nerve goes to each

5  side.  But the -- this is all the spinal canal.

6  There's no encroachment, no pressure upon, there's

7  nothing abnormal here.  This is a textbook, normal

8  lumbar spine.

9  Q.   Okay.  So, Doctor, let's go to your opinions, and

10  I think you've -- I think you've given those opinions,

11  but let's just make sure that -- I think you've given

12  them as we viewed the films, but let's just finish this

13  out.  Your first opinion, can you -- can you see it and

14  read it?

15  A.   Yes, sir.  Do you want me to read it?

16  Q.   Sure.  Go ahead.  Go right ahead.

17  A.   "Mrs. Carroll was involved in a motor vehicle

18  accident 9-13-22.  She had multiple subjective

19  complaints, but imaging studies were normal.  There is

20  no damage identified to the lumbar or cervical spine.

21  The discs are well maintained in height and there's no

22  degenerative change or ruptured fragment.  There's no

23  compromise on the spinal canal or the nerve roots as

24  we've seen."

25  Q.   All right.  And so that's your first opinion.  And



DR. DAVID J. GOWER                                      September 11, 2024
JOANNA CARROLL vs SALE ABUBAKAR                                        39

1   that's pretty much what you -- what you just told me as
2   we were looking at the film; is that correct?
3   A.    Yes, sir.
4   Q.    All right.  Your second opinion is -- you can read
5   that.
6   A.    "Physical therapy, chiropractic therapy were
7   appropriate.  She had complaints of pain and had been
8   under trauma.  These modalities are appropriate."
9   Q.    Well, if -- would you consider that conservative
10  treatment, physical therapy, and chiropractic --
11  chiropractic therapy?
12  A.    Yes.
13  Q.    And so you believe those were appropriate because
14  she was in pain?
15  A.    Well, I believe they were appropriate because of
16  her complaints.  As we mentioned, when people get
17  involved in lawsuits and secondary gain, you can't be
18  completely sure about their -- their pain complaints.
19  But it does make sense with what she's saying.  She was
20  involved in a motor vehicle accident and this -- the --
21  the physical therapy and chiropractic therapy have
22  almost no risk or downside.  I believe that it is
23  appropriate conservative therapy.
24  Q.    How long do you think that -- if it's appropriate,
25  how long do you think that should have lasted?



1  A.    I think that the treatment that she had, I can't

2  remember.  I think it was like 20 sessions was -- is an

3  appropriate period of time.

4  Q.    And so when conservative therapy doesn't work

5  after an appropriate -- appropriate period of time,

6  then what is the next step, in your opinion?

7  A.    Well, you do need to make sure there's no other

8  pathology that accounts for the patient's complaints,

9  and they did that.  They did MRI scans.  They were

10 normal.  At that point, it should have stopped.

11 Q.    Okay.  So you think they should have stopped even

12 though she was in pain?

13 A.    Exercise and time would probably have been a -- a

14 more reasonable treatment past that point, once you've

15 cleared her cervical and lumbar spine of damage.

16 Q.    You think she should have been just discharged?

17 A.    Or supervised physical therapy and -- and

18 chiropractic therapy.  I think the people at AICA were

19 at least on the right track.

20 Q.    Okay.  And number three, "There is no

21 justification for a five-level violation of the disc in

22 the cervical and lumbar spine to remove disc material

23 in an 18-year-old lady with a normal scan."  I think

24 that's pretty self-explanatory, right?

25 A.    And I stand by that statement.  This is absolutely



1    wrong.  There should not have been a -- a percutaneous

2    discectomy twice.  Each of those levels was

3    instrumented twice.  Was it two weeks apart?  There's

4    no indication for that procedure.  There's nothing

5    wrong in the spine that needs to be intervened in.  So

6    the treatment that was rendered by Comprehensive Pain &

7    Spine is wrong.

8    Q.   Okay.  "There is no justification for a five-level

9    procedure to heat and coagulate the central disc

10   material in the cervical and lumbar spine in an

11   18-year- old lady."  That's pretty much that second

12   procedure, right?

13   A.   Yes, sir.  The Disc-FX, which is putting a wire in

14   there and cooking it.  There used to be an -- a

15   procedure called Intradiscal Endothermic Therapy, IDT,

16   same basic idea.  The Disc-FX does give you the option

17   of taking out additional disc material.  None should

18   have been taken out in the first place.  She never

19   should have had her disc instrumented at all.  That was

20   just flat wrong.

21   Q.   Now, in the past, have you done a -- have you

22   performed these two procedures, the procedures that you

23   say shouldn't have been done in number three and

24   shouldn't have been done in number four?

25   A.   No.  Most -- most surgeons don't do percutaneous



1  procedures.  Some do.  Most don't.  But I have not.  I

2  have not done a percutneous discectomy or the Disc-FX

3  procedure.  I've sent people out -- I've sent people

4  out to other -- that I was convinced that it would

5  help.

6  Q.   That was my question.  You have referred people to

7  get these procedures?

8  A.   Yes.  And somebody that has abnormal pathology in

9  their back, it may be effective.  It's not an

10 ineffective procedure.  It just is inappropriate to do

11 it to an 18-year-old that has normal discs.

12 Q.   So the times where you referred someone out to

13 have these procedures done, they had abnormal discs?

14 A.   Yes.

15 Q.   Is that -- would that be correct?

16 A.   Yes.

17 Q.   All right.  And so if a person had an abnormal

18 disc, then this would be -- this could be an

19 appropriate procedure?

20 A.   It's not the procedure that's the problem.  It's

21 the patient selection.  The procedure does have its

22 value in -- in certain situations.  This is not one of

23 them.

24 Q.   I understand.

25 A.   It was wildly inappropriate in this patient.



DR. DAVID J. GOWER                                September 11, 2024
JOANNA CARROLL vs SALE ABUBAKAR                                    43

1   Q.    I understand that, Doctor.  You made that point.

2   What I'm trying to figure out is when it -- when is it

3   appropriate?  You keep going back to when that is not

4   appropriate in this case, and I get that.  That's been

5   established.  What I'm trying to find out is you've

6   referred people for these procedures.  Obviously, you

7   referred them because you felt that they were

8   appropriate.  And so I'm just trying to figure out,

9   what are those circumstances where this is appropriate?

10  Because you've already said there's nothing wrong with

11  this procedure.

12  A.    If -- if you can document that there is a bulge

13  that encroaches or presses upon a specific nerve and

14  the patient has symptoms in that nerve -- say it's the

15  L5-S1 disc bulges, the -- the nerve that goes past it

16  is irritated.  So you end up with the side of your foot

17  numb, reflex at your ankle gone, and weakness in the

18  ability to stand on your toes.  That person might

19  benefit from a simpler procedure than an open

20  operation, especially if the disc isn't ruptured.  For

21  a disc that's only bulging that -- where it's more to

22  one side than the other -- this might be an appropriate

23  procedure.

24  Q.    I got it.  So if -- if there was a disc that was

25  bulging more to side than another, then this would be



1  an appropriate procedure?

2  A.   And -- and had symptoms referable to that, not

3  just -- every -- well, not everybody, but a good

4  percentage of the people I've seen over -- over 30

5  years old have disc bulges.  The -- the discs lose

6  their elasticity and they tend to bulge.  Most of those

7  people don't need a procedure done.  But if it fits

8  with their symptoms and their physical findings, then,

9  yes, it would be a reasonable alternative.

10  Q.   Okay.  And so, Doctor, just going back to the

11  images, I understand you -- you are showing us a cross

12  section of C5 and C6.  Did you see any disc bulge at C3

13  and C4?

14  A.   No.  There's not, and the jury won't either.  That

15  side view shows you the center of the disc, and there

16  is no area where the disc extends beyond the -- the

17  back of the vertebral body.  There is no bulge at all

18  at any level in the cervical spine, much less C5-6.

19  Q.   And so if I said the same thing about C4 and C5,

20  your answer would be the same?

21  A.   Yes, sir.

22  Q.   So -- so if I -- I could go through this entire

23  cervical spine and ask you:  "Do you see a bulge at

24  this level throughout the spine," your answer would be,

25  "None"?



1  A.   Correct.  And that is as you would expect in
2  somebody 18 years old.
3  Q.   And then the same for the lumbar spine.  Do you
4  see a bulge at L2-L3?
5  A.   No.
6  Q.   What about L3 and L4?
7  A.   No.
8  Q.   L4 and L5?
9  A.   No.
10 Q.   Okay.  And then is it that there is no L5 and L --
11 is that --
12 A.   It -- it never separated.  It never formed.
13 Q.   It never formed.  So that would be it?
14 A.   Well, yes.  Since he says there's four, and four
15 were operated upon, it'd be 1-2, 1-2, 2-3, 3-4, 4-5;
16 5-1 doesn't exist.
17 Q.   Got it.  Okay.  And, Doctor, have I covered all of
18 your opinions in the case?
19 A.   I think so.
20 Q.   I am going to stop the screen share.  I think
21 we've covered this document pretty thoroughly.  You see
22 anything I missed, Doctor?
23 A.   No, sir.
24 Q.   Doctor, did you look at any MRIs from her thoracic
25 spine?



1    A.   I -- I don't believe so.  No.

2    Q.   Okay.  Doctor, is there anything that you could

3    have been provided that you weren't provided that you

4    needed to make your opinions?

5    A.   Not that I can think of.  There's no gaps that I

6    could find.  In other words, sometimes a note says --

7    the note the doc so-and-so sent said this, and you

8    don't have records.  But that doesn't exist in this

9    case.  I believe I've seen everything that there is, at

10   least up until the last note, which was June 13th of

11   '23.

12   Q.   Got it.  And, Doctor, you -- you never met Ms.

13   Carroll, have you?

14   A.   No, sir.

15   Q.   Okay.  You're not one of her treating physicians?

16   A.   No, sir.

17   Q.   Have you ever spoken with any of her treating

18   physicians?

19   A.   No, sir.

20   Q.   Okay.  And, Doctor, when you -- when you say this

21   is a kind of a classic -- I'm not sure -- I'm -- I got

22   to remember your words, but it was a perfect spine,

23   kind of what you said.  If you had to look in a -- a

24   medical book and -- and look up perfect spine, this

25   would be one.  What if -- if I wanted to do my own



1  research, how could I verify what you just said?  You

2  know, is --

3  what -- what documents could I look at?

4  A.   I'd probably do a literature search on MRI scans

5  of lumbar spine.

6  Q.   Okay.  Is there a certain -- you would just do a

7  Google search?

8  A.   Well, I've -- I've been doing this for 34 years,

9  so I've seen an awful lot of MRI scans of the -- the

10 spine.  I wouldn't -- I don't need to look it up, but

11 if you were going to look it up, that would be the

12 place.

13 Q.   No, I mean me.  Not you.  I know you had --

14 could -- I mean me.

15 A.   Yeah.  If -- if you were going to look it up, that

16 would be a good place to look.

17 Q.   Okay.  Is there any treatise or something that

18 doctors use outside of just Google?

19 A.   Oh, sure.  There are textbooks, but I can't think

20 of any specific one that's, like, authoritative.

21 Q.   Okay.  Doctor, you looked at Dr. Puppala's

22 deposition, correct?

23 A.   Yes.

24 Q.   Did he provide a justification for why he

25 performed these procedures?



1  A.   Not adequate, no.  It -- it -- the only

2  justification is pain -- pain and I think -- I think

3  restricted activity and that was it.  His physical exam

4  is very limited and only done, I think on one occasion,

5  by his PA, and that documents restricted range of

6  motion.  But it also says that she has weakness,

7  numbness, and reflex changes in upper and lower

8  extremities.

9       But there are four extremities and it's not clear.

10  If -- if you're really going to say that there's

11  something specifically wrong, you need to say which

12  nerve isn't working right, what's numb, what doesn't

13  work, what's weak, and none of that is there.  It's --

14  it's a very broad, probably inadequate physical exam.

15  Q.   Got it.  So in your opinion, he should have -- if

16  upper extremities was not specific enough, you -- you

17  --

18  A.   No.

19  Q.   -- you would've expected for him to identify the

20  exact extremity and the exact issue with that

21  extremity; is that correct?

22  A.   You'd think.  Specifically, since he wants to do

23  an operation at C5-6, he -- he really would've been --

24  it would've been a great benefit to be able to document

25  a reflex change in the biceps, weakness in the biceps



1   specifically, not just everywhere, and -- and a -- a

2   numb thumb.  That's what the C6 nerve root that comes

3   through that hole does.  That's not documented.  It

4   just is she's weak all over, she's numb all over, she

5   has

6   no -- her reflexes are abnormal.  Let -- let's do a

7   six, you know, a five-level discectomy.

8   Q.   And, Doctor, the fact that her pain -- I hate to

9   say decreased -- the fact that her pain decreased, I

10  guess she got better, how does that factor into your

11  opinion about whether this procedure was correct or

12  not?

13  A.   That's correct.  And this procedure -- the

14  procedure is not correct.  It's not done for the right

15  indications nor the right justification.  This is

16  somebody who has a normal back and probably would have

17  gotten better with a combination of exercise and time.

18  And as time went by, she got better.  In the interim,

19  somebody stuck a needle in her disc at multiple levels,

20  but I -- that's not causative.

21  Q.   So in your opinion, it's just the time that she

22  would have -- she would have gotten better over time,

23  regardless?

24  A.   That would be a reasonable explanation for

25  somebody with a back that looks like this.



1  Q.   Do you know about Ms. Carroll's pain level today?

2  A.   No.  The last note that I have is from '23.

3  Q.   Okay.  Doctor, tell us about the films that you

4  reviewed.  Would you have rather additional -- do you

5  think the MRI films were the right views, the right

6  type of MRIs?  Is there something else you would've

7  wanted to review if you had the opportunity?

8  A.   There -- there is -- as far as I know, there is

9  nothing else to review.  The -- the two MRI scans are

10 it.  What I showed you on those selective pictures are

11 selective.  I have the complete study, all the levels,

12 cross-sections, all the levels from the side, as well

13 as plain X-rays that I can satisfy on my own suspicion

14 that she only has four lumbar vertebra.  I don't think

15 there's anything else that would have been of greater

16 value than this -- this imaging that she's already had.

17 And, like I said, I've got the complete study that

18 there's, what, 68 images for the cervical, something

19 like that.  Sixty-eight for the -- I can tell you

20 exactly.  Yes.  Sixty-three for the lumbar and 62 for

21 the neck.  That would have been 125 pictures to include

22 in this report, and that's just too voluminous.  The --

23 the ones I showed get the point across.  There's

24 nothing wrong.

25 Q.   And they were quality -- quality MRI films?



1  A.    It's a nice quality MRI.  Yes, it is.

2  Q.    That's my question.  How do you -- tell us a

3  little bit about how you bill for your services?  Do

4  you do a flat fee, hourly billing?  How do -- how does

5  it -- how does your billing work?

6  A.    By the number of pages.  And in this particular

7  case, that -- that original bill was -- I -- I reviewed

8  1,970 pages and four imaging studies and a callback.

9  And that's what -- and then wrote that report.  And

10  that's what resulted in the initial charge.  And I

11  believe that was the only charge, except when you

12  requested the -- you subpoenaed documents from me on

13  the 3-4-24 and I charged you $350 for that, for

14  preparation or compiling them and sending them.  But

15  other than that, it's by the number of pages, not by

16  the number of hours.

17  Q.    And then of course, for this deposition, you

18  charge, is it $3,000?

19  A.    Well, I ask you for a -- a prepayment on that

20  because sometimes people don't pay, but the -- it's

21  the -- the time is what -- for this is the -- what --

22  what sets the fee.  So right now, we're an hour and ten

23  minutes.  So it's 2,000 for the first hour and 250 for

24  each additional quarter-hour.  So we're at 2,250.

25  Q.    Well, we started at one hour and ten minutes.  So



1  I'm looking at half -- half an hour for that.  You got

2  to charge your -- your lawyers for that other ten

3  minutes because I'm almost done.

4  A.   All right.  I'll spot you on that.  I'll give you

5  an hour.

6  Q.   Can you spot me there?

7  A.   But -- But the real answer is, if you already

8  wrote and sent the check, as you had said, when it

9  arrives, either I can turn it around to it back or I

10  can cash it and give you a refund for the balance.  I

11  only charge you for the time that's actually used.  But

12  you'd be surprised how many people use the two hours.

13  Q.   No. I'm not going to use two hours.  I'm -- I'm

14  coming to a close.

15  A.   Okay.

16  Q.   I've got about three more questions.  Do you know

17  how many files you've reviewed over the last two years

18  for Dennis, Corry, Porter & Dixon?

19  A.   No, I don't.  It -- It -- they're a fairly big

20  defense firm, so I -- it's -- it's probably 50 or more

21  in the last two years.

22  Q.   Okay.  How many times have you testified at trial?

23  A.   Not many.  Most of these are depositions like

24  we're doing today.  To actually go to trial, I -- I --

25  the last one I think was a medical malpractice case in



 1   -- in Tennessee, and that was several years ago.  It's
 2   -- it's uncommon to actually go to trial.
 3   Q.   Do you have any criticism -- it sounds like you
 4   don't -- of the doctors over at AICA and their
 5   treatment of Ms. Carroll?
 6   A.   No.  I think they were reasonable in their --
 7   their use of the -- of their -- their imaging studies,
 8   the use of the chiropractic, the use of the physical
 9   therapy.  You know, the -- the lumbar and cervical
10   epidurals can be both diagnostic and therapeutic.  They
11   may help you understand what the problem is.  So I --
12   I'm not critical of that either.
13   Q.   Got it.  Your -- your main criticism is for Dr.
14   Puppala at Comprehensive Spine, correct?
15   A.   Yeah.  Basically, yes.
16           MR. BOZEMAN:  Yeah.  Okay.  All right.  Thank
17   you, Doctor.  Those are all of my questions.  I
18   appreciate you.
19           THE REPORTER:  No more questions from any
20   other attorneys?
21           MR. BOZEMAN:  Not from me.  And there's still
22   some other attorneys.
23           MR. NORTH:  We don't have any.
24           THE REPORTER:  Okay.
25           MR. BOZEMAN:  All right.  I think we're done.



```
 1              THE REPORTER:  Ms. Spinelli, could you please
 2     put your email in the chat for me just so I can have it
 3     on file.
 4              And at this time, I would like to take
 5     transcript orders.
 6              Mr. Bozeman, would you like a transcript
 7     order, sir?
 8              MR. BOZEMAN:  Yes, please.
 9              THE REPORTER:  Would you like it --
10              MR. BOZEMAN:  Just -- just condensed E-Tran.
11              THE REPORTER:  Okay.  Expedited or standard,
12     sir?
13              MR. BOZEMAN:  Standard.
14              THE REPORTER:  All right.  Ms. Spinelli,
15     would you like a transcript, ma'am?
16              I can't hear her.  Is she talking or --
17              MR. BOZEMAN:  Attorney Spinelli, you're --
18     you're muted.  We still can't hear her.
19              MS. SPINELLI:  I'd like a mini E-Tran.
20              THE REPORTER:  Mini.  Okay.  Standard or
21     expedited?
22              MS. SPINELLI:  With the exhibits.
23              THE REPORTER:  Standard or expedited?
24              MS. SPINELLI:  Standard.
25              THE REPORTER:  All right.  Mr. North, would
```



1    you like a transcript order, sir?

2            MR. NORTH:  We're not ordering one at this

3    time.

4            THE REPORTER:  All right.  Thank you.  And at

5    this point in time, I will be going off the record.

6            THE WITNESS:  Wait, wait.  You didn't ask if

7    I wanted to read or sign.

8            THE REPORTER:  Oh, I mean, I can't ask that.

9    I can't.

10           THE WITNESS:  Oh, who does?

11           MS. SPINELLI:  I do.

12           THE WITNESS:  Oh, oh.

13           MS. SPINELLI:  Would you like to -- are you

14   familiar with the process of reading and signing?

15           THE WITNESS:  Yeah, yeah.

16           MS. SPINELLI:  What would you like to do?

17           THE WITNESS:  I'll waive.  I don't want to

18   read and sign.

19           MS. SPINELLI:  Okay.

20           THE REPORTER:  All right.  At this point in

21   time, I will be going off the record.  Thank you all.

22        (Deposition concluded at 2:16 p.m.)

23

24

25



1                    CERTIFICATE OF REPORTER

2             I, ANTHONY PATTERSON, a Digital Reporter,

3    Notary Public, and Certified Court Reporter in and for

4    the State of Georgia, do hereby certify:

5                 That the foregoing witness was duly sworn;

6    that the proceeding took place before me at the time

7    and place herein set forth; that the testimony and

8    proceedings were accurately captured with annotations

9    by me during the proceeding.

10                I further certify that I am not related to

11   any of the parties to this action by blood or marriage

12   and that I am not interested in the outcome of this

13   matter, financial or otherwise.

14                IN WITNESS THEREOF, I have hereunto set my

15   hand this 13th day of September, 2024.

16

17

18        
          _____

19        ANTHONY PATTERSON

20        Notary Commission Georgia/W-00628386

21        Commission Expires: October 16, 2027

22

23

24

25

1              CERTIFICATE OF TRANSCRIPTIONIST

2        I, Rita R. Reilly, Certified Shorthand

3   Reporter/Registered Professional Reporter do hereby

4   certify:

5             That the foregoing is a complete and true

6   transcription of the original digital audio recording

7   of the testimony and proceedings captured in the

8   above-entitled matter.  As the transcriptionist, I have

9   reviewed and transcribed the entirety of the original

10  digital audio recording of the proceeding to ensure a

11  verbatim record to the best of my ability.

12            I further certify that I am neither attorney

13  for nor a relative or employee of any of the parties to

14  the action; further, that I am not a relative or

15  employee of any attorney employed by the parties

16  hereto, nor financially or otherwise interested in the

17  outcome of this matter.

18            IN WITNESS THEREOF, I have hereunto set my

19  hand this 13th day of September, 2024.

20

21

22

23            Rita R. Reilly, CSR/RPR

24

25

DR. DAVID J. GOWER
JOANNA CARROLL vs SALE ABUBAKAR

September 11, 2024
Index: $262,000..90

---

**$**

**$262,000**
10:6

**$262,747**
9:17

**$3,000**
51:18

**$350**
51:13

**$600**
13:24

**$8,825**
9:15

---

**1**

**1**
10:25
11:1,9,
15,23

**1,970**
51:8

**1-2**
45:15

**10**
25:4
30:13

**1099**
9:17
10:18

**1099s**
10:2

**11**
4:2

**11-1-22**
16:18

**11th**
4:5

**12**
7:23

**12-22**
35:12

**125**
50:21

**12th**
26:13

**13th**
18:5,21
20:22,24
30:9,25
31:1
46:10

**14th**
21:3

**16th**
21:7
29:22

**17th**
26:17,22

**18**
18:25
45:2

**18-year-**
41:11

**18-year-old**
19:9 35:1
37:16
40:23
42:11

**1981**
7:10

**1988**
7:14

**19th**
21:24
29:14,18
38:1

**1:10**

**4:4**

**1st**
25:11

---

**2**

**2,000**
51:23

**2,250**
51:24

**2,500**
13:23

**2-3**
45:15

**20**
25:15,19
26:13
40:2

**2022**
18:5,8,11

**2023**
9:11,15
28:2,23

**2024**
4:2,5

**20th**
27:17

**21st**
25:14,23
26:2,5,6

**22**
7:24 8:4,
17

**22nd**
28:2,6,23

**23**
9:12 28:6
30:25
31:1
46:11

**50:2**

**250**
51:23

**28th**
25:3

**2:16**
55:22

---

**3**

**3-4**
45:15

**3-4-24**
51:13

**30**
44:4

**30th**
24:3
30:10

**34**
47:8

**3978**
14:7

---

**4**

**4-5**
45:15

---

**5**

**5**
11:13

**5-1**
45:16

**50**
52:20

**5th**
18:7,11

**29:9**

---

**6**

**62**
50:20

**68**
50:18

---

**7**

**70**
29:9,10

**75**
25:15

---

**8**

**80**
26:20

---

**9**

**9-**
35:11

**9-12**
36:8

**9-12-22**
35:13
36:5

**9-13-22**
38:18

**9-19**
36:6

**9-19-22**
35:13
36:11

**90**
10:8

---



**94**
  7:18

**95**
  10:8,11

**99**
  10:8

---

**A**

---

**ability**
  43:18

**abnormal**
  38:7
  42:8,13,
  17 49:6

**Absent**
  5:5,12

**absolutely**
  33:2
  34:22
  37:20
  40:25

**Abubakar**
  4:7

**accident**
  8:14
  13:14,21
  18:4 19:8
  38:18
  39:20

**accomplished**
  16:19
  28:9 36:4

**accounts**
  40:8

**acquired**
  16:17

**Act**
  6:9

**active**
  8:25 9:1,
  11,21,24

**actively**
  9:5

**activity**
  48:3

**actual**
  36:10

**Adalalol**
  19:20

**Adam**
  4:23

**Adderall**
  19:23,24

**addition**
  15:16

**additional**
  30:15
  41:17
  50:4
  51:24

**adequate**
  48:1

**administration**
  5:14

**afternoon**
  6:13

**age**
  19:8

**agree**
  5:13
  22:15
  31:4
  32:5,6,7
  35:3,5
  36:1,12

**agreeable**
  5:17,19

**agreement**
  5:21 6:6

**ahead**
  15:24
  32:22
  38:16

**AICA**
  14:17
  21:6,19
  40:18
  53:4

**allowed**
  5:15 6:8

**alternative**
  44:9

**amounted**
  20:7

**analogy**
  37:14

**and/or**
  30:17

**anesthetic**
  30:17

**ankle**
  43:17

**annulus**
  37:11

**Anthony**
  4:7

**appearance**
  5:2

**appearing**
  5:2

**approach**
  30:19

**April**
  29:9

**area**
  26:23
  44:16

**arrives**
  52:9

**arrow**
  34:7,11

**arrows**
  33:9

**assistant**
  7:15
  21:18

**assuming**
  14:21
  15:12
  21:24
  23:5

**Athens**
  14:20
  20:6,11

**Atlanta**
  4:15

**Atlas**
  14:20

**attempt**
  24:17

**attendance**
  4:17

**attention**
  19:24

**attorney**
  4:19 8:15
  12:6,7
  54:17

**attorneys**
  10:18
  53:20,22

**audio**
  4:12 15:3

**authoritative**
  47:20

**automobile**

**8:14**

**awful**
  47:9

---

**B**

---

**back**
  5:10 8:1
  18:23
  19:10
  20:1,16
  21:1,21
  25:4,19
  27:25
  28:10
  32:25
  36:19
  37:14,19
  42:9 43:3
  44:10,17
  49:16,25
  52:9

**background**
  6:23 7:8

**balance**
  52:10

**base**
  36:21

**based**
  17:15

**basic**
  41:16

**basically**
  18:12
  28:10
  30:1,6
  53:15

**begin**
  6:3

**beginning**
  8:16



behalf
  4:21,23
  5:3

benefit
  43:19
  48:24

biceps
  33:8
  34:19
  48:25

big
  20:15
  52:19

bill
  51:3,7

billing
  51:4,5

bit
  6:22 7:7
  8:1 13:16
  51:3

blocks
  30:16

board
  10:15,17

body
  44:17

bold
  28:5

bolded
  28:3
  29:22

bone
  36:20

bones
  37:4

book
  46:24

bottom
  36:2,18

Bowman
  7:12

Bozeman
  4:19 5:19
  6:4,12,14
  10:22
  11:3
  15:2,10,
  11 24:1,2
  35:21,23
  53:16,21,
  25 54:6,
  8,10,13,
  17

branch
  30:16

broad
  48:14

brought
  32:23

built
  37:4

bulge
  32:16
  33:3,4
  37:21
  43:12
  44:6,12,
  17,23
  45:4

bulges
  43:15
  44:5

bulging
  43:21,25

burn-the-
nerve
  30:21

───────────

C

───────────

C3

44:12

C4
  44:13,19

C5
  44:12,19

C5-
  22:14

C5-6
  22:6
  32:16
  33:7
  44:18
  48:23

C5-c6
  33:18

C6
  22:14
  44:12
  49:2

call
  9:22

callback
  51:8

called
  21:6 30:1
  41:15

calling
  7:5

canal
  38:5,23

caption
  13:18

capture
  13:10

captures
  13:12

capturing
  4:11

cardiac
  20:3

care
  13:13
  20:25

Carolina
  7:16,17

Carroll
  4:6,20
  13:6,21
  15:14
  18:21
  24:6
  38:17
  46:13
  53:5

Carroll's
  15:17
  50:1

case
  4:6 6:20
  8:15
  13:5,18
  20:19
  43:4
  45:18
  46:9 51:7
  52:25

cases
  9:8,9,11
  10:16,17

cash
  52:10

causative
  49:20

center
  37:3,5,19
  44:15

central
  37:15
  41:9

certified
  4:8

cervical
  16:23
  21:25
  22:6
  24:10
  26:9,21
  27:15
  28:9,25
  29:10,20
  30:7,13
  32:12
  38:20
  40:15,22
  41:10
  44:18,23
  50:18
  53:9

change
  12:25
  16:7
  25:24
  34:18,21
  38:22
  48:25

changed
  14:1

charge
  51:10,11,
  18 52:2,
  11

charged
  13:23
  51:13

chat
  54:2

check
  52:8

chiropracti
c
  21:5 24:7
  39:6,10,
  11,21
  40:18
  53:8



chronological
17:12,14

circumstances
43:9

Civil
4:10 5:16
6:9

classic
46:21

clear
10:4
23:24
35:8 48:9

cleared
40:15

clinical
7:23

close
52:14

coagulate
41:9

columns
16:14

combination
49:17

communicate
35:7

communicated
31:1

companies
10:10

compiling
51:14

complaining
21:21
24:6

complains
27:25

complaint
18:2

complaints
20:25
25:25
26:15
30:11
38:19
39:7,16,
18 40:8

complete
12:18,21
13:10
50:11,17

completed
12:19
16:4
17:17

completely
39:18

Comprehensive
14:21
27:22
41:6
53:14

compressed
33:13

compromise
38:23

computer
4:13

concluded
55:22

condensation
22:10

condensed
54:10

confirmed
4:15

congenital
20:1

conservative
39:9,23
40:4

consistent
27:10
32:2

constitute
5:21

contraceptive
19:21

controlling
24:17

controversy
23:21

convinced
42:4

cook
30:6

cooking
41:14

copied
22:9,10

cord
33:11,21
34:20

corner
35:9
36:1,2
37:25
38:2

correct
9:5,6
10:1,3
14:23

15:14
16:9
18:5,8,23
19:6
20:19,20
21:5,22
22:1,2,
16,20
23:20
24:7,10
25:9,12,
16 26:14,
23 27:13,
19 28:25
29:1,11
31:20
39:2
42:15
45:1
47:22
48:21
49:11,13,
14 53:14

Corry
13:19
52:18

counsel
5:13 6:2,
6

Counsels
5:5

couple
16:14
37:24

court
4:8 12:1

covered
45:17,21

CR
17:1

create
17:14

crescent
33:12

critical
53:12

criticism
53:3,13

cross
44:11

cross-
section
33:5

cross-
sections
50:12

crosstalk
15:8
19:10,16
25:5

cursor
32:18

cut
17:2
37:12,13,
18

CV
7:6

_____

D

damage
38:20
40:15

damaged
28:15

data
14:3
36:10

date
12:10
14:4



16:17
17:15
25:25
28:7
35:11,25
36:1,3
38:1

David
  4:1,6
  5:25 6:5
  7:4 11:18

day
  8:13
  16:18
  20:17
  21:8
  27:15

days
  25:15,19
  26:13

deal
  20:15

dealing
  34:15

December
  8:4

decide
  17:20

decreased
  49:9

defendants
  4:22 5:3

defense
  10:9
  11:25
  52:20

deficit
  19:24

degenerative
  38:22

Dekompresso
r
  29:6

demand
  14:21,22
  15:12,13

demonstrate
  35:1

Dennis
  13:19
  52:18

depends
  27:5

deposed
  6:15

deposition
  4:1,5,9
  6:5,7
  12:20,23
  13:8
  16:1,5,7
  23:8,11,
  18 31:15,
  22,23
  32:7
  47:22
  51:17
  55:22

depositions
  52:23

desired
  31:2

diagnostic
  15:20
  24:18
  53:10

disagree
  31:19
  34:1

disc
  22:7
  23:4,5

29:5
30:4,5
32:13
33:4
37:3,4,15
40:21,22
41:9,17,
19 42:18
43:15,20,
21,24
44:5,12,
15,16
49:19

Disc-fx
  30:1
  41:13,16
  42:2

discectomy
  28:8,23
  29:1
  30:20
  32:14
  41:2 42:2
  49:7

discharged
  40:16

disclosed
  6:20

discovery
  6:7 15:18

discs
  22:23,25
  32:17
  33:1 37:1
  38:21
  42:11,13
  44:5

disk
  22:14

dispute
  19:5

distinguish
  8:25

Dixon
  4:21 5:17
  13:19,20
  52:18

doc
  46:7

doctor
  7:20
  33:16
  37:22
  38:9 43:1
  44:10
  45:17,22,
  24 46:2,
  12,20
  47:21
  49:8 50:3
  53:17

doctors
  47:18
  53:4

document
  11:22,23,
  24 12:9
  43:12
  45:21
  48:24

documented
  49:3

documents
  21:15
  47:3 48:5
  51:12

donut
  37:15

Dorothy
  4:24 5:1

downside
  39:22

drainage
  17:24

driver's
  4:16

duly
  6:1

───────────

E

E-TRAN
  54:10,19

earned
  9:25

earnings
  8:21

Eastern
  4:4

easy
  28:5

echoes
  5:10 8:1

educational
  7:7

Edwin
  26:6

effective
  26:20
  42:9

elastic
  37:7

elasticity
  44:6

electrical
  30:5

electronic
  4:12

email
  54:2

employed
  8:4,6



encroaches
  43:13

encroachment
  38:6

end
  20:17
  35:19
  43:16

ended
  7:14

Endothermic
  41:15

entire
  44:22

entities
  10:14

entries
  21:9

entry
  5:2 18:7,
  10

epidural
  16:16
  24:13,15
  26:3,19

epidurals
  53:10

equal
  33:2

equipment
  4:12

error
  23:1

ESI
  16:12
  24:10,12,
  22

Esquire
  4:9

established
  43:5

et al
  4:7

evidence
  37:21

exact
  10:7
  48:20

exam
  21:16
  26:7,15
  48:3,14

examination
  6:11
  21:14,18
  25:24

exams
  26:4

excuse
  7:25

exercise
  40:13
  49:17

exhibit
  10:25
  11:1,9,
  15,23
  13:16

exhibits
  54:22

exist
  34:19,21
  45:16
  46:8

expect
  19:1 45:1

expected
  48:19

expedited

54:11,21,
23

expert
  6:20
  8:10,11
  9:2,5

explanation
  49:24

extends
  44:16

extremities
  26:9
  48:8,9,16

extremity
  48:20,21

eye
  34:22

————————————

        F

————————————

FACS
  11:18

fact
  18:17
  19:7 23:6
  49:8,9

factor
  49:10

fairly
  20:15
  52:19

familiar
  11:10
  55:14

federal
  4:10 5:16
  6:8 12:1

fee
  51:4,22

feed

30:4

felt
  43:7

figure
  43:2,8

file
  54:3

filed
  5:2

files
  52:17

filled
  37:5

film
  17:2
  34:22
  39:2

films
  23:3,9
  38:12
  50:3,5,25

final
  5:15

financial
  9:22

find
  43:5 46:6

finding
  20:6
  28:19,20

findings
  12:12
  17:10,11
  44:8

fine
  10:3

finish
  38:12

Finished
  7:10

firm
  11:24,25
  13:19
  14:22
  15:13
  52:20

firms
  10:13

fits
  44:7

five-level
  28:8
  40:21
  41:8 49:7

five-six
  33:4

flat
  41:20
  51:4

Florida
  7:10

fluid
  33:12
  34:2,3
  37:8

fluoxetine
  19:18

foot
  25:8
  43:16

Forest
  7:13

forget
  34:3

form
  4:14

formed
  6:22
  45:12,13

forward



20:21

fourth
  16:25
  17:7

fragment
  38:22

free
  19:3

frequency
  30:20

front
  33:6
  37:14,19

full
  7:2

——— G ———

gain
  39:17

gaps
  46:5

gasket
  37:5

gave
  18:12

generating
  24:21

Georgia
  4:8,15
  6:9 7:17,
  18,22

give
  41:16
  52:4,10

goal
  34:25

good
  6:13 35:4
  36:12

44:3
47:16

Google
  47:7,18

government
  10:13

Gower
  4:1,6
  5:23,25
  6:5,13
  7:4,5,6
  11:18
  15:3
  35:16

gray
  7:12
  33:11
  37:10

great
  48:24

greater
  50:15

gristle
  37:5,6

group
  8:6,8,18
  31:8

guess
  13:7
  26:17
  30:22
  49:10

guessing
  24:20

——— H ———

half
  52:1

hand
  5:23

happened
  29:25

happening
  16:13

hate
  19:25
  23:1 35:3
  37:14
  49:8

head
  26:11

headphone
  8:2

Health
  15:20

hear
  32:1
  54:16,18

Hearing
  5:20

heat
  41:9

heated
  30:5

height
  33:2 37:3
  38:21

helping
  14:11

helps
  19:1

herniation
  22:14
  32:15
  37:21

herniations
  22:7 23:4

Hertado
  21:17

hired
  10:9 12:6

hiring
  10:14,15

history
  18:19,22
  20:12,18
  21:18

hole
  33:7,9
  49:3

hour
  51:22,23,
  25 52:1,5

hourly
  51:4

hours
  51:16
  52:12,13

hydrated
  37:8

——— I ———

idea
  9:7,10
  18:12
  20:13
  37:17
  41:16

identificat
ion
  11:2

identified
  26:1
  38:20

identify
  4:17
  11:15,22
  12:5
  48:19

identity
  4:15

IDT
  41:15

image
  32:12,17

images
  12:13
  13:20
  32:10
  44:11
  50:18

imaging
  17:17
  28:4,21
  38:19
  50:16
  51:8 53:7

import
  18:10

important
  17:22

improved
  31:3,5,7,
  10,13,18
  32:4

inadequate
  48:14

inappropria
te
  42:10,25

incident
  19:4

incision
  29:3

include
  17:20,21
  50:21

included
  10:20
  16:3



including
  35:4

income
  8:19,22,
  24  9:1,
  16,17,18,
  21,22,24,
  25  10:17,
  18,20

incorrect
  23:1

indication
  33:14
  34:17
  41:4

indications
  49:15

ineffective
  42:10

initial
  51:10

injection
  16:12,17
  24:13,15,
  16  25:12,
  15  26:19,
  23  30:17

injections
  27:1

injured
  28:15

injuries
  13:22

injury
  17:25
  18:1

instrument
  29:6

instrumented
  41:3,19

insurance
  4:25
  10:10

intake
  21:19

interesting
  37:24

interim
  49:18

Internal
  20:6,11

internship
  7:11

interval
  20:1

intervened
  41:5

Intradiscal
  41:15

invasive
  33:14

investments
  8:20,21,
  23,24

involved
  38:17
  39:17,20

irritated
  43:16

issue
  20:3
  23:15
  48:20

issues
  20:18

J

jelly
  37:15,16

Joanna
  4:6,20
  13:21
  15:13,17

job
  6:20

John
  4:21  7:4
  13:19

joint
  30:18

Jones
  26:6
  27:18

June
  30:25
  31:1
  46:10

jury
  31:25
  35:1,7
  44:14

justification
  40:21
  41:8
  47:24
  48:2
  49:15

justifies
  28:20

justify
  28:21

K

kill
  30:6

kind
  15:4
  23:23

33:14
  35:15,18
  46:21,23

kinds
  28:13,18

knowing
  31:14

L

L1-2
  23:4

L2-3
  23:4

L2-l3
  45:4

L3
  45:6

L3-4
  23:4

L4
  45:6,8

L4-5
  23:4

L5
  45:8,10

L5-s1
  16:12
  23:6
  43:15

lady
  40:23
  41:11

larger
  14:12,13

lasted
  39:25

lastly
  12:14
  20:8

law
  13:19
  14:22
  15:13

lawsuit
  28:17

lawsuits
  39:17

lawyer
  33:17

lawyers
  10:10
  52:2

leave
  17:25

left
  12:17
  21:1  25:8
  32:16
  33:18,25
  34:3,5,
  10,11,16

leg
  21:2  26:8

legal
  9:20

lesion
  30:21

letters
  33:7

level
  28:24
  31:3
  32:13,16
  34:17
  38:4
  44:18,24
  50:1

levels
  28:24
  30:7



31:10
41:2
49:19
50:11,12

**license**
4:16 7:22

**ligament**
37:11,19

**limited**
48:4

**listed**
20:12

**literature**
47:4

**local**
30:17

**located**
4:14

**long**
8:7,10
39:24,25

**longer**
8:17 20:4

**longest**
21:9

**looked**
47:21

**lose**
44:5

**lot**
47:9

**Lotus**
15:20

**low**
21:21

**lower**
26:9 38:1
48:7

**lowered**

15:4

**lumbar**
16:21
22:1,21,
22,23,24,
25 24:10
25:12,15
26:23
28:9,24
29:10,21
30:8,12
36:24
38:8,20
40:15,22
41:10
45:3 47:5
50:14,20
53:9

─────────

**M**

─────────

**M.D.**
11:18

**made**
9:10,15,
17 10:6
21:11
23:13
43:1

**main**
53:13

**maintained**
38:21

**make**
9:4 29:3
31:25
38:11
39:19
40:7 46:4

**making**
14:11,13

**malpractice**
52:25

**March**
28:2,6,23

**marked**
10:23,25
11:1,9,15

**material**
30:4
37:15,20
40:22
41:10,17

**means**
17:2

**meant**
10:4

**medial**
30:16

**medical**
7:9
10:15,16
13:20,23
14:18
15:15,20
18:18
19:14
20:18
46:24
52:25

**medical-**
9:20

**medical-legal**
9:18

**medicals**
19:17

**medication**
18:13,14

**medications**
28:16

**Medicine**
7:13
20:6,11

**mentioned**
9:18
23:17
39:16

**met**
6:15
46:12

**mid-back**
21:21

**mind**
5:8

**mine**
37:2 38:3

**mini**
54:19,20

**minimal**
20:14

**minute**
15:1

**minutes**
51:23,25
52:3

**missed**
45:22

**misspoke**
9:24

**mister**
35:16

**modalities**
39:8

**money**
9:5,10
28:17

**month**
26:18

**months**
18:8

**motion**
21:16
48:6

**motor**
13:13,21
20:23
26:7,10
38:17
39:20

**move**
20:21
24:3
32:17

**moved**
7:16,17,
18

**moving**
32:18

**Mr.[sic**
6:13 15:3

**MRI**
16:21,23
21:25
22:8 23:2
32:12
36:20
40:9
47:4,9
50:5,9,25
51:1

**MRIS**
17:8 22:4
45:24
50:6

**multiple**
26:25
38:18
49:19

**muscle**
29:3

**muted**
54:18

**muting**
5:8



---

**N**

---

**National**
  4:25

**necessarily**
  33:25

**neck**
  18:22
  21:21
  27:25
  50:21

**needed**
  46:4

**needle**
  29:4 30:2
  32:14
  49:19

**nerve**
  24:17
  30:18
  33:8,10
  38:4,23
  43:13,14,
  15 48:12
  49:2

**nerves**
  30:6
  38:2,3

**neurologic**
  21:16

**neurosurger**
**y**
  7:11
  11:19

**nice**
  51:1

**Nine-**
**nineteen**
  36:7

**Nine-twelve**

35:14

**normal**
  22:5
  26:4,5,9,
  12,16
  28:10,11
  33:2,13
  34:22
  35:1,5
  36:19
  37:3,20
  38:7,19
  40:10,23
  42:11
  49:16

**North**
  4:23,25
  5:6,8,10
  7:16,17
  53:23
  54:25
  55:2

**notary**
  4:8

**note**
  30:24
  46:6,7,10
  50:2

**noted**
  25:23

**notice**
  6:6

**November**
  25:11,23

**numb**
  43:17
  48:12
  49:2,4

**number**
  9:9 10:7
  13:2,9
  16:15
  27:12

36:20
40:20
41:23,24
51:6,15,
16

**numbered**
  23:5

**numbering**
  22:25
  23:19

**numbers**
  9:13
  31:7,10,
  13

**numbness**
  26:2 48:7

---

**O**

---

**oath**
  5:14 32:2

**objection**
  5:12,20

**objective**
  28:19,20

**obtained**
  16:4

**occasion**
  48:4

**occur**
  30:23

**occurred**
  18:4

**October**
  25:3

**offer**
  13:22

**office**
  17:23

**Oklahoma**
  7:15

**open**
  43:19

**operated**
  45:15

**operation**
  43:20
  48:23

**opinion**
  9:21
  10:24
  38:13,25
  39:4 40:6
  48:15
  49:11,21

**opinions**
  6:21,22
  12:10,14,
  25 13:2,
  6,10,13,
  22 38:9,
  10 45:18
  46:4

**opportunity**
  50:7

**opposed**
  29:2

**opposite**
  34:3

**option**
  41:16

**options**
  30:3

**oral**
  19:21

**order**
  17:12,14
  54:7 55:1

**ordered**
  17:18

**ordering**
  55:2

**orders**
  54:5

**organizatio**
**n**
  21:6

**original**
  26:19
  51:7

**originally**
  9:12

**Orthopedics**
  14:17

**ouch**
  28:14

**outer**
  37:10

**ovary**
  18:15
  20:8,15

---

**P**

---

**p.m.**
  4:4 55:22

**PA**
  26:1 48:5

**pages**
  11:9,12
  51:6,8,15

**pain**
  18:14,23
  19:3,8,10
  21:1,21
  24:18,21
  25:4,19
  26:1,14,
  15,21
  27:19,20,
  22,25



28:11,12,
13,18
29:20,21
30:12,13
31:2,3,4,
10,18
32:3
39:7,14,
18 40:12
41:6 48:2
49:8,9
50:1

part
21:19
37:8,10,
11

passive
8:24
9:18,22

past
40:14
41:21
43:15

pathology
28:12
40:8 42:8

patient
8:14 13:1
17:16
34:5,15
42:21,25
43:14

patient's
40:8

patients
7:23 8:3
24:23

Patterson
4:7 6:4

pay
51:20

paycheck

9:16

PDF
14:6,7,9
16:8

PDFS
12:11
14:5

people
20:5
28:13,15,
18 39:16
40:18
42:3,6
43:6
44:4,7
51:20
52:12

percent
10:8,9,
11,12,20
25:16
26:20
29:9,10

percentage
10:6,8
35:4 44:4

percutaneou
s
29:1 30:2
32:14
41:1,25

percutneous
42:2

perfect
16:10
17:10
37:1
46:22,24

performed
20:11
41:22
47:25

period
40:3,5

permanent
27:10

person
36:24
37:6
42:17
43:18

phonetic
19:20
21:17
22:12

physical
20:13
21:5
25:24
26:7,15
39:6,10,
21 40:17
44:8
48:3,14
53:8

physician
21:15,17
27:5

physician's
21:18
31:8

physicians
8:6,7,18
31:12
46:15,18

pick
28:5

picture
32:23
34:5,16,
24 35:6,
10 36:9,
16,18,21
37:23

pictures
12:13
50:10,21

Piedmont
8:6,7,18
9:17

place
41:18
47:12,16

plain
23:3,9
50:13

plaintiff
4:20 6:14

plaintiff's
10:13,18,
25 11:1,
9,15,23

plenty
34:2

point
8:5
26:12,16
37:3
40:10,14
43:1
50:23
55:5,20

pointing
34:4

Porter
52:18

portfolios
9:22

potential
26:2

Potentially
24:16

practice
6:9 7:14,
23 8:13

27:9

practiced
7:16

practicing
7:14,20

preliminaries
7:2

preparation
13:24
51:14

prepared
32:23

prepayment
51:19

presses
43:13

pressure
38:6

pretty
14:8 21:4
39:1
40:24
41:11
45:21

previous
18:15

prior
18:7,8,
13,20
19:8,14
25:24,25

problem
14:14
34:17,20
42:20
53:11

procedure
4:11 5:16
6:9 16:18
28:4,20,



23 29:2,
23,25
30:2,3,9,
10,21,23
33:15
41:4,9,
12,15
42:3,10,
19,20,21
43:11,19,
23 44:1,7
49:11,13,
14

procedures
17:16
28:4 29:8
30:16
41:22
42:1,7,13
43:6
47:25

proceed
23:25

proceeding
4:12

process
55:14

professiona
l
7:8

Professiona
lly
7:20

professor
7:15

prolonged
20:1

proud
35:2

provide
13:3
47:24

provided
11:24,25
12:6,7,15
25:15
46:3

public
4:8

pull
29:3

Puppala
12:20
16:1
23:16,17
28:10
53:14

Puppala's
12:23
13:8 16:7
23:8,11
47:21

purpose
6:7 24:14

purposes
5:15 6:8

pursuant
4:10 6:6

pursuits
9:1

put
18:2 25:4
35:2 54:2

putting
41:13

Q

QT
20:1

quality
50:25
51:1

quarter-
hour
51:24

question
18:3
35:21
42:6 51:2

questions
6:21
52:16
53:17,19

R

radiation
25:8

radio
30:20

radiologist
22:11,13,
19 32:15

radiology
12:11
16:10,11
17:2,17

raise
5:23

raised
26:8

range
21:16
48:5

re-ask
35:21

read
7:6 10:14
13:8
14:14
23:4,17
25:20
31:15,23

38:14,15
39:4
55:7,18

reading
55:14

reads
13:18

real
52:7

reasonable
40:14
44:9
49:24
53:6

reasons
24:25
28:13,18

recall
14:9,16

received
9:1 12:19

recommendat
ion
24:9

recommended
24:22
30:15

record
4:4,11,18
7:3 8:19
10:4
23:25
29:19
55:5,21

recorded
30:12

recording
4:13

records
9:13,15
13:20

14:18
15:16
17:13
18:24
19:14
46:8

redone
16:6

referable
13:6 44:2

reference
13:5
31:21

referral
27:22

referred
42:6,12
43:6,7

reflex
26:10
34:18,21
43:17
48:7,25

reflexes
26:8 49:6

refund
52:10

region
30:18

reinforce
18:20
19:2

reinforced
23:10

reinforces
18:17

relates
20:18

released
31:2



**relevance**
  17:24

**relevant**
  18:1

**relief**
  24:7
  25:16
  27:10
  29:9,10

**remember**
  23:24
  35:10
  40:2
  46:22

**reminder**
  23:23

**remote**
  5:13

**remount**
  29:5

**removal**
  18:15
  20:9

**remove**
  30:4
  40:22

**removing**
  20:15

**rendered**
  41:6

**report**
  12:1,5
  13:24
  16:4
  22:19
  23:13,16
  32:9,11
  50:22
  51:9

**reported**
  9:25

13:22
25:6,17,
18 31:7,
9,13,24
32:15

**reporter**
  4:3,8
  5:4,7,9,
  12,18,20
  6:2 15:1,
  6,9 23:23
  35:15,18,
  22 53:19,
  24 54:1,
  9,11,14,
  20,23,25
  55:4,8,20

**reporting**
  29:17

**reports**
  27:20
  29:19

**represent**
  4:18,20
  6:14

**represented**
  31:17

**representing**
  32:3

**represents**
  17:6

**requested**
  12:2
  51:12

**research**
  47:1

**residency**
  7:11

**resolved**
  26:3

**respect**
  18:22

**responses**
  15:17

**rest**
  14:17

**restricted**
  48:3,5

**resulted**
  51:10

**results**
  22:8

**retained**
  6:19

**retired**
  7:21,23

**returned**
  26:14

**review**
  8:11,15,
  19 9:2,5,
  11 12:11
  13:20,23
  14:4
  23:10
  50:7,9

**reviewed**
  9:8
  10:16,17
  12:22
  14:6
  15:18
  16:11
  50:4 51:7
  52:17

**reviews**
  9:19,21

**rib**
  36:22

**risk**
  39:22

**Rob**
  4:19 6:13

**room**
  33:19

**root**
  49:2

**roots**
  38:23

**Roto-rooter**
  29:4

**Rules**
  4:10 5:16
  6:8

**running**
  21:1

**ruptured**
  38:22
  43:20

————————

**S**

————————

**sacrum**
  22:24

**Saleh**
  4:7

**satisfy**
  50:13

**savings**
  8:20

**scan**
  32:12
  36:20
  37:12,13
  40:23

**scans**
  40:9
  47:4,9
  50:9

**school**
  7:9,13

**screen**
  11:4,5,6
  32:19
  36:9
  45:20

**scroll**
  11:11

**search**
  47:4,7

**season**
  9:14,15

**secondary**
  39:17

**section**
  12:12
  14:3
  44:12

**sections**
  12:14

**sees**
  27:18

**selection**
  42:21

**selective**
  50:10,11

**self-explanatory**
  14:8 21:4
  40:24

**sending**
  51:14

**sensation**
  33:9
  34:18

**sense**
  39:19

**sensory**
  26:7,10

**sentence**
  15:23



**separate**
  22:23

**separated**
  45:12

**September**
  4:2,5
  18:5,21
  20:22,24
  21:3,7
  24:3

**series**
  16:16
  27:4

**services**
  51:3

**sessions**
  40:2

**sets**
  51:22

**settle**
  24:17

**shallow**
  22:6,14
  23:4

**share**
  11:4
  45:20

**shell**
  37:17

**shoulder**
  21:1

**show**
  10:23
  19:13
  32:9,24
  33:1
  34:18,23
  36:20

**showed**
  22:19
  50:10,23

**showing**
  11:8
  22:18
  32:19
  33:17
  44:11

**shows**
  34:14
  36:21
  44:15

**side**
  26:12
  33:5,18,
  19,23,24
  34:3,4,5,
  9,10,11,
  14,15
  38:5
  43:16,22,
  25 44:15
  50:12

**sign**
  26:11
  55:7,18

**signature**
  11:17,19,
  20

**signed**
  11:23

**significant**
  18:18,22
  19:10
  20:18,24
  21:8,13
  22:3 24:5
  25:5

**signing**
  55:14

**simpler**
  43:19

**sinus**
  17:24

**sir**
  5:24 6:2,
  18,25
  10:5,21
  12:8
  14:2,10,
  19 15:6
  16:22
  18:6
  24:1,4,11
  25:7,21
  27:16
  29:16
  33:22
  34:25
  35:8
  36:3,6,17
  38:15
  39:3
  41:13
  44:21
  45:23
  46:14,16,
  19 54:7,
  12 55:1

**situations**
  42:22

**Sixty-eight**
  50:19

**Sixty-three**
  50:20

**small**
  36:9

**Smith**
  13:19

**so-and-so**
  46:7

**software**
  4:13

**sole**
  8:18,22

**Solutions**
  4:9

**sort**
  33:11

**sounds**
  15:3 23:1
  26:20
  27:6 53:3

**source**
  8:19,22

**space**
  30:5
  33:24

**spasticity**
  34:21

**speak**
  23:24
  35:4

**specialized**
  4:13

**specific**
  43:13
  47:20
  48:16

**specifically**
  48:11,22
  49:1

**spinal**
  24:13,15
  33:10,12,
  21 34:1,
  3,20
  38:5,23

**spine**
  16:21,23,
  25 22:1
  26:10,21
  27:15,22
  28:24,25
  29:10,11
  33:3 35:1
  37:20
  38:8,20

**40**:15,22
  41:5,7,10
  44:18,23,
  24 45:3,
  25 46:22,
  24 47:5,
  10 53:14

**Spinelli**
  4:24 5:1
  54:1,14,
  17,19,22,
  24 55:11,
  13,16,19

**spoken**
  46:17

**spot**
  52:4,6

**spreadsheet**
  17:15

**springy**
  37:6

**Spurling**
  26:10

**stand**
  17:1
  24:12
  40:25
  43:18

**standard**
  4:4
  54:11,13,
  20,23,24

**stands**
  17:5

**start**
  5:6 8:13

**started**
  51:25

**starts**
  8:12
  13:17



21:4

**state**
4:18,25
7:2
10:15,16

**stated**
25:1
31:17

**statement**
22:7,8
23:13
31:25
40:25

**stenography**
4:14

**step**
40:6

**steroid**
16:17
24:16
25:12,15
26:19,22,
25 30:17

**stick**
29:4 30:2

**stipulation**
5:21

**stop**
11:13
45:20

**stopped**
8:3
40:10,11

**straight**
26:8
34:12

**straightforward**
13:25

**struck**
20:22

**structure**
33:11
37:9

**Stryker**
29:5

**stuck**
32:14
49:19

**studied**
16:12

**studies**
17:17
28:5,21
38:19
51:8 53:7

**study**
33:1,13
35:5,11
36:3 38:1
50:11,17

**subjective**
38:18

**submitted**
14:22

**subpoenaed**
9:13
51:12

**Subsequently**
7:13

**Sunawaski**
22:11

**supervised**
40:17

**supposed**
33:4

**surgeons**
41:25

**surgeries**
20:14

**surgery**
18:15
20:8

**surgical**
29:2

**surprised**
19:12,13
52:12

**surprises**
13:11

**surprising**
19:7

**surrounded**
33:11

**suspicion**
50:13

**swear**
5:22

**sworn**
5:24 6:1,
10

**symptom**
28:12,19

**symptoms**
43:14
44:2,8

———————

**T**

———————

**taking**
18:13,14
41:17

**talk**
21:9

**talked**
15:25

**talking**
35:24
54:16

**tax**
9:14

**telemedicine**
29:13,15

**tells**
24:19

**ten**
26:21
29:20
30:13
31:3
51:22,25
52:2

**tend**
44:6

**Tennessee**
53:1

**tenth**
16:8

**test**
26:8

**testified**
6:1 32:2
52:22

**testimony**
8:10,19
9:2,5
32:1

**textbook**
35:2 38:7

**textbooks**
47:19

**therapeutic**
53:10

**therapy**
21:5
39:6,10,
11,21,23
40:4,17,
18 41:15

53:9

**thing**
9:4 11:14
16:6
26:10
44:19

**things**
18:13
37:24

**Thirty-four**
8:12

**thoracic**
45:24

**thought**
24:5 36:7

**thumb**
33:8
34:18
49:2

**time**
4:4 5:13
23:24
40:3,5,13
49:17,18,
21,22
51:21
52:11
54:4
55:3,5,21

**timeline**
17:12,18,
21

**times**
42:12
52:22

**today**
6:20 50:1
52:24

**today's**
4:12

**toes**



43:18

**told**
  39:1

**top**
  34:24
  35:6,25
  36:16

**totally**
  30:19

**tough**
  37:7

**tougher**
  37:16

**track**
  24:19
  40:19

**tractor-
trailer**
  20:23

**transcript**
  5:15
  54:5,6,15
  55:1

**trauma**
  39:8

**treating**
  21:4
  46:15,17

**treatise**
  47:17

**treatment**
  13:23
  24:7
  30:19
  31:5,11,
  18 32:4
  39:10
  40:1,14
  41:6 53:5

**trial**
  13:4

52:22,24
53:2

**true**
  18:25

**turn**
  7:25
  26:11
  52:9

**turned**
  26:4,5

**type**
  50:6

**typed**
  11:18

_____

      U
_____

**uncommon**
  19:9
  26:25
  53:2

**undergo**
  30:15

**undergradua
te**
  7:9

**understand**
  6:25 10:3
  19:11
  31:23
  42:24
  43:1
  44:11
  53:11

**underwent**
  26:22

**University**
  7:10,15

**upper**
  32:12
  35:9

37:25
48:7,16

**urgent**
  20:25

_____

      V
_____

**vehicle**
  13:13,21
  38:17
  39:20

**verbatim**
  4:11

**verify**
  47:1

**versus**
  4:6

**vertebra**
  22:23,24
  33:6
  36:20,22,
  25 50:14

**vertebral**
  44:17

**view**
  44:15

**viewed**
  38:12

**views**
  50:5

**violation**
  40:21

**visit**
  29:13,15

**voluminous**
  50:22

_____

      W
_____

**W-2**

9:16

**wait**
  55:6

**waive**
  55:17

**Wake**
  7:13

**walk**
  13:17

**wanted**
  46:25
  50:7 55:7

**water**
  37:8

**wave**
  20:4

**weak**
  48:13
  49:4

**weakness**
  26:2
  34:19
  43:17
  48:6,25

**weeks**
  41:3

**whatsoever**
  33:3,14
  37:21

**white**
  33:12
  37:4,7

**wife**
  8:21

**wildly**
  42:25

**Winston-
salem**
  7:12

**wire**
  30:5
  41:13

**words**
  24:18
  46:6,22

**work**
  8:7,10
  24:20
  27:4,6,11
  28:16
  40:4
  48:13
  51:5

**working**
  8:17
  48:12

**works**
  24:19

**worries**
  15:10

**would've**
  48:19,23,
  24 50:6

**wreck**
  18:21

**written**
  13:24

**wrong**
  24:20
  37:2
  41:1,5,7,
  20 43:10
  48:11
  50:24

**wrote**
  51:9 52:8

_____

      X
_____

**X-RAYS**



```
 16:15,16
 17:3,4,7
 50:13
```

---

### Y

---

**year**
```
 7:10,16
 9:7
```

**years**
```
 7:11 8:9,
 12 18:25
 44:5 45:2
 47:8
 52:17,21
 53:1
```

**younger**
```
 37:6
```

